UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| (1)   GREGORY ABBOTT, | ) | |
| (2)   MARCIA ABBOTT, | ) | |
| (3)   JANE BUCKINGHAM, | ) | |
| (4)   GORDON CAPLAN, | ) | Criminal No. 19-CR-10117-IT |
| (5)   ROBERT FLAXMAN, | ) | |
| (6)   FELICITY HUFFMAN, | ) | |
| (7)   AGUSTIN FRANCISCO HUNEEUS, | ) | |
| (8)   MARJORIE KLAPPER, | ) | |
| (9)   PETER JAN "P.J." SARTORIO, | ) | |
| (10)  STEPHEN SEMPREVIVO, and | ) | |
| (11)  DEVIN SLOANE, | ) | |
| | ) | |
| Defendants | ) | |

## GOVERNMENT'S MEMORANDUM REGARDING THE METHODOLOGY FOR CALCULATING GAIN OR LOSS UNDER THE SENTENCING GUIDELINES

ANDREW E. LELLING
United States Attorney

ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant United States Attorneys

Date: September 5, 2019

The government respectfully submits this memorandum in advance of the September 10, 2019 hearing regarding the methodology for calculating the enhancement for gain or loss under the applicable Sentencing Guidelines.[1]

## **INTRODUCTION**

As part of their plea agreements, all of the defendants have stipulated that, pursuant to Section 2B1.1(b) of the Sentencing Guidelines, their offense levels should be enhanced based on the amount of money each parent paid to facilitate the fraud scheme.  Such stipulations "will generally govern the resolution of that issue," *see United States v. Granik*, 386 F.3d 404, 411 (2d Cir. 2004), and courts are permitted to rely on the parties' stipulations in finding facts relevant to sentencing.  *See id.* at 412; *United States v. Berndt*, 127 F.3d 251, 253-55, 258 (2d Cir. 1997) (affirming sentencing enhancement based on factual stipulations contained in state court plea agreement); *United States v. Bilal*, 941 F. Supp. 2d 397, 404 (S.D.N.Y. 2013) (denying motion to vacate restitution order where defendant "stipulated that the loss amount attributable to his conduct was greater than $1 million but less than $2.5 million"); *Kapelioujnyi v. United States*, 779 F. Supp. 2d 250, 255 (E.D.N.Y. 2009) (denying petition under 28 U.S.C. § 2255 and finding sentencing court was "within its discretion" in relying on stipulations regarding defendant's role in RICO conspiracy and loss amount).

Notwithstanding these stipulations, the final and draft Presentence Investigation Reports ("PSRs") prepared to date conclude that the immediate victims of the defendants' conduct—the affected universities and standardized testing agencies—suffered no cognizable pecuniary harm for Guidelines purposes.  In the absence of pecuniary harm, the PSRs conclude that gain may not

---

[1] The government is also submitting to the Court an Appendix containing documents cited herein, with the exception of victim-impact statements, which have been provided to the Court by the Probation office.

be used as a substitute for loss.  As a result, the PSRs calculate the *same* Guidelines offense level for every defendant (with no enhancement for gain or loss under Section 2B1.1(b)(1) regardless whether the defendants paid bribes of $15,000 or $400,000).

The government respectfully submits that the PSRs' conclusion is mistaken.  The Sentencing Guidelines consistently include enhancements based on monies paid, received, lost, or gained in the course of the criminal conduct.  *See, e.g.*, U.S.S.G. §§ 2B1.1, 2B4.1 and 2C1.1. Indeed, as set forth below, numerous circuits, including the First Circuit, have in similar circumstances applied Section 2B4.1, the commercial bribery guideline, to private sector honest services fraud cases, resulting both in a higher base offense level *and* the enhancement of that level, based on the bribe amount, pursuant to the loss table in Section 2B1.1.  And in a pending case in the Southern District of Florida that closely parallels this one, the PSR recommends the application of Section 2C1.1 to likewise enhance the base offense level based on the value of the bribe pursuant to Section 2B1.1.

There can be little dispute that the universities and testing agencies have suffered, and will continue to suffer, pecuniary harm, and that this harm was a reasonably foreseeable consequence of the defendants' conduct.  Although the victims' financial losses are difficult to quantify with precision, the Guidelines instruct that where a precise loss amount cannot be "reasonably determined," the Court should substitute the gain from the offense—in this case, the amounts the defendants intended to pay their co-conspirators to facilitate the bribery and fraud scheme—which are the amounts to which the parties stipulated in the plea agreements.  Such an approach is consistent with the way the Guidelines treat bribe payments generally, would align the Guidelines ranges in this case with those of similarly situated defendants nationwide, appropriately reflect relative culpability and thus help to achieve a just result.

# I.     USC AND GEORGETOWN SUFFERED PECUNIARY HARM

Both USC and Georgetown, the principal university victims of the charged scheme, suffered demonstrable pecuniary harm from the defendants' conduct.[2]

First, as the defendants have acknowledged by pleading guilty to conspiracy to commit honest services fraud, the universities lost the value of their corrupt employees' honest services. While it is difficult to calculate that value precisely, the loss can be approximated by looking to the salaries the universities paid to the employees the defendants and their co-conspirators conspired to bribe—monies the universities would not have paid had they known their employees were corrupt, and that they stopped paying as soon as they found out.

Second, the defendants' scheme caused both USC and Georgetown to undertake costly internal investigations separate and apart from the government's investigation. These costs were a direct and foreseeable consequence of the defendants' fraud.

Third, although the Sentencing Guidelines do not recognize reputational harm as a compensable loss, where such reputational harm results in pecuniary harm, such losses are cognizable. *See, e.g.*, U.S.S.G. § 2B1.1 cmt. n.3(C)(v) (loss includes any reduction in the value of

---

[2] Section 2B1.1 of the Sentencing Guidelines defines "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money," and provides that, in determining "loss" for purposes of the enhancement in Section 2B1.1(b), "loss is the greater of actual loss or intended loss." *See* U.S.S.G. § 2B1.1 cmt. n.3(A). Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* n.3(A)(i). Intended loss is "the pecuniary harm that the defendant purposely sought to inflict" and "includes intended pecuniary harm that would have been impossible or unlikely to occur," such as where the scheme was interrupted before it could succeed. *Id.* n.3(A)(ii). The Guidelines set forth several factors to consider in estimating loss, including (1) the fair market value or replacement cost of the property unlawfully taken; (2) the cost of developing proprietary information; (3) the cost of repairs; and (4) more general factors, such as the scope and duration of the offense and revenues generated by similar operations. *Id.* n.3(C)(i)-(iii) & (vi). The Guidelines provide that the Court "need only make a reasonable estimate of loss," *id.* n.3(C), and that where "there is a loss but it reasonably cannot be determined," the Court "shall use gain that resulted from the offense as an alternative measure of loss," *id.* n.3(B).

"corporate assets" that resulted from the offense).  Here, the evidence indicates that the universities

will foreseeably experience a decline in applications for admission as a result of the scheme, which

will translate into a direct pecuniary loss in the form of lost application fees.

**A.      Defendants Paid Bribes to USC and Georgetown Employees, Costing the Universities the Full Value of Their Employees' Honest Services**

Ample precedent in honest services fraud cases supports the proposition that the salaries

paid by victim organizations to bribe recipients constitute pecuniary losses to those victims.[3]   This

makes sense.  An employer pays an employee a salary to retain that employee's loyal services.

Here, USC and Georgetown paid salaries to employees who were also receiving bribes as part of

the charged conspiracy.  These employees feigned loyalty to their employers, while secretly acting

to their employers' detriment by selling admission to athletically unqualified students in exchange

for bribes.  In so doing, the fraud scheme deprived the victim universities of the full value of the

salaries they paid the corrupt employees.  The table below sets forth the approximate salaries that

the corrupt employees of Georgetown and USC received during the period in which they were also

accepting bribes:

---

[3] *See, e.g., United States v. Crawley*, 533 F.3d 349, 357 (5th Cir. 2008) (affirming loss to be the full value of the salary and benefits defendant received from his union while accepting kickbacks and noting that "[b]y intentionally depriving Local 988 of honest services, Crawley *obviously* inflicted some level of pecuniary harm on the organization") (emphasis added); *United States v. Bahel*, 662 F.3d 610, 648-49 (2d Cir. 2011) (in determining restitution, court found that salary paid to employee convicted of honest services fraud was "plainly 'property' that belonged to" employer and subject to forfeiture); *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir. 1998) ("We may assume that [the employer] would not have hired [defendant] had it known of his intentions, and in that event it would not have paid him four years' salary . . . [W]hat [the employer] lost . . . [was] the difference in the value of the services that [defendant] rendered . . . and the value of the services that an honest [employee] would have rendered.").

| Employee | Period in which Employee Received Bribes | Approximate Total Salary Received During Period in which Employee Received Bribes[4] |
|---|---|---|
| Donna Heinel (USC) | February 2014 to March 2019 | $1,164,116 |
| Jovan Vavic (USC) | January 2014 to March 2019 | $1,232,945 |
| Ali Khosroshahin (USC) | October 2012 to November 2013 | $331,542[5] |
| Laura Janke (USC) | October 2012 to January 2014[6] | $74,322 |
| Gordon Ernst (Georgetown) | January 2012 to June 2018[7] | $361,653[8] |

Whether the pecuniary harm for Guidelines purposes is the full value of the salary or some portion of it—in recognition of the fact that the employees also provided some legitimate services—is less relevant than the *fact* that the universities suffered a pecuniary loss.  In *United States v. Crawley*, for example, the district court determined that the entire amount of the defendant's salary should be deemed "loss" because it was not possible to "apportion what part of [the salary] he really earned and what part he didn't earn."  533 F.3d at 357 (further citation and internal quotation marks omitted).  Other courts have concluded that the better measure of loss is "'the difference in the value of the services that [the defendant] rendered . . . and the value of the services that an honest [employee] would have rendered.'"  *Bahel*, 662 F.2d at 650 (brackets and

---

[4] These figures do not include car allowances or other fringe benefits.

[5] This figure includes a salary payout of approximately $122,282 Khosroshahin received following his termination by USC in November 2013, which reflects a payment for which USC received no services from Khosroshahin.

[6] USC terminated Janke in January 2014.

[7] While Ernst's acceptance of bribes pre-dates January 2012, the government is in possession of salary information going back only to January 2012.  The figures for Vavic, Khosroshahin and Janke reflect only those periods as currently charged, but understate the loss to USC insofar as they do not include earlier periods for which there is evidence that the defendants also accepted bribes while receiving salaries.

[8] This figure includes salary payments totaling approximately $65,732.43 that Ernst received between January 1, 2018 and June 30, 2018, a time when Georgetown had placed him on leave but not yet fired him.  Georgetown received no services for this payment.

ellipsis in original) (quoting *Sapoznik*, 161 F.3d at 1121).   Because that difference can be difficult to calculate, courts have concluded that a percentage of the total salary—ranging between 10 percent and 25 percent—is reasonable under the Guidelines.  *See, e.g.*, *Bahel*, 662 F.2d at 648-50 (noting that "it would be unduly complex to try to delineate which part of the $876,000 [salary] was paid for honest services and which part was paid for the dishonest services," and using 10 percent as a "conservative estimate of the cost of the fraud") (internal citations and quotations omitted); *Sapoznik*, 161 F.3d at 1121-22 (finding that 25 percent of salary paid to corrupt police chief was loss for purposes of calculating restitution).   Applying those same ranges to this case would result in estimated losses to USC of between $280,292 and $700,731, and to Georgetown of between $36,165 and $90,413.[9]  Yet it is precisely because the losses are difficult to calculate that it is appropriate, as an alternative, to substitute the value of the bribe and related payments the defendants made in calculating the relevant offense level, as the parties have stipulated.

**B.   Georgetown and USC Have Been Forced, at Great Expense, To Conduct Internal Investigations and To Revise Policies and Programs as a Result of The Defendants' Fraud**

The victim universities have also incurred costs in investigating the defendants' fraud. Although the Guidelines exclude from the calculation of loss the costs of assisting the government in its investigation, *see* U.S.S.G. § 2B1.1 cmt. n.3(D)(ii) (loss shall not include "costs incurred by victims primarily to aid the government in[] the prosecution and criminal investigation of an offense"), investigative costs are properly included where, as here, a victim engages counsel for reasons independent of the government's inquiry.  *See United States v. DeRosier*, 501 F.3d 888, 895 (8th Cir. 2007) (recognizing that investigative costs incurred to aid the government are not

---

[9] Given the sheer volume of students alleged to have been the beneficiaries of the bribery scheme involving Heinel (nearly three dozen) and Ernst (more than 10), a range closer to 50-75 percent of salary might be more appropriate.

counted in the loss calculation, but that attorneys' fees and related costs are properly included

where "the investigation was prompted for the bank's own benefit"); *United States v. Piggie*, 303

F.3d 923 (8th Cir. 2002) (victim's investigative fees into coach's scheme to deprive university of

the honest services of college basketball players were properly included in calculating loss for

Guidelines purposes).[10]

Here, Georgetown launched an investigation into tennis coach Gordon Ernst in late 2017,

nearly one year before the government contacted the university about Ernst's scheme.[11]

Georgetown engaged a law firm to conduct the investigation, which determined that Ernst had

been violating university policies by selling admissions slots to unqualified tennis players.  As a

result, Georgetown placed Ernst on leave and ultimately forced him to resign.  All this occurred

*before* federal investigators contacted Georgetown about Ernst's fraud.  The internal investigation

also continued after the government's investigation was made public in March 2019.[12]  As a result

of the scheme, Georgetown undertook an extensive review of students recruited by Ernst, spending

hundreds of hours "individually reviewing each student's case and . . . taking serious disciplinary

---

[10] *But cf. Lagos v. United States*, 138 S.Ct. 1684 (2018) (holding, with respect to claims for restitution, as opposed to loss, that the words "investigation" and "proceedings" in the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A(b)(4), refer to government investigations and criminal proceedings, and that section does not permit an award of restitution for private investigations and civil proceedings).  *But see United States v. Gammell*, 932 F.3d 1175 (8th Cir. 2019) (distinguishing *Lagos* and finding that private investigative costs may be compensable restitution under 18 U.S.C. § 3663A(b)(1) with respect to damage, loss, or destruction of property).

[11] *See, e.g.*, Winton, Richard, *Long before college admissions scandal, universities saw signs of fraud on campus*, L.A. TIMES (May 20, 2019), *available at* https://www.latimes.com/local/lanow/la-me-college-admissions-scandal-universities-what-know-explainer-20190520-story.html; Georgetown University, Update on the U.S. Department of Justice Investigation (March 12, 2019), *available at* https://www.georgetown.edu/media-advisories/03122019b.

[12] Letter from Georgetown University (Aug. 2, 2019).

action" as appropriate, and ultimately adopted a new policy for student-athlete recruitment and admissions, in an effort to protect itself against similar frauds.[13]

Likewise, although USC began assisting the government in approximately November 2018, the university subsequently launched its own internal investigation of 33 students to determine whether they had lied on their USC applications.[14]  That investigation continues.[15]  USC has also hired consultants to review its admissions policies in light of the defendants' scheme.[16]

The need for the victim universities to investigate their corrupt employees upon learning of the fraud scheme was reasonably foreseeable to the defendants.  Indeed, the reputational harm the universities suffered from the scheme, and the critical importance of academic integrity to research universities generally, *required* that the universities review their practices to determine who was involved in perpetrating the fraud, who benefited from it and how to prevent it from recurring.

Finally, as a result of the defendants' conduct, USC and Georgetown have been named in multiple putative class actions alleging that they were negligent and violated consumer protection

---

[13] *Id.*

[14] Rubin, Joel and Matthew Ormseth, *How many students cheated to get into USC? A look inside the admissions investigation*, L.A. TIMES (July 16, 2019), *available at* https://www.latimes.com/local/lanow/la-me-college-admissions-usc-20190716-story.html; *see also* Letter from University of Southern California (Aug. 7, 2019); University of Southern California, Updates regarding college admissions investigation, *available at* https://news.usc.edu/155195/statement-regarding-college-admissions-investigation/ (last updated Aug. 12, 2019); University of Southern California, USC information on college admissions issue (Aug. 11, 2019), *available at* https://news.usc.edu/155225/usc-information-on-college-admissions-issue/.

[15] *Id.*

[16] *Id.*

and unfair competition laws.[17]  The universities have incurred legal fees defending against these lawsuits,[18] which would not have been filed but for the defendants' fraud.

### C.     USC and Georgetown Will Predictably Suffer Lost Revenues as a Result Of the Fraud Scheme

Georgetown and USC derive significant revenues from application fees.  One predictable consequence of the reputational harm both universities have suffered as a result of defendants' fraud is a decline in the number of applicants and a resulting loss of application fees.

For example, a recent market research poll concluded that "[t]here has been a significant negative impact to the USC brand," as a result of the fraud scheme, and that, of the schools measured, USC's name was most associated with the terms "scandal" and "cheating."[19]  Although the arrests in this case occurred too late in the admissions cycle to have an impact on the number of applications to USC's class of 2023, a recent academic study suggests that the university can expect a decline in applications on the order of 10 percent for each of the next two years.[20]

---

[17] *See, e.g.*, *Olsen, et al. v. Singer, et al.*, No. 3:19-cv-01351 (N.D. Cal. Mar. 13, 2019) (dismissed without prejudice on March 15, 2019 in light of *Bendis* matter); *Bendis, et al. v. Singer, et al.*, No. 5:19-cv-01405 (N.D. Cal. Mar. 15, 2019) (dismissed as to USC, Georgetown, and Wake Forest on July 5, 2019 in light of *Tamboura* matter); *Tamboura, et al. v. Singer, et al.*, No. 5:19-cv-03411 (N.D. Cal. June 14, 2019) (pending as to Georgetown, USC, and other affected schools as of Sept. 4, 2019).

[18] *E.g.*, Letter from Georgetown University (Aug. 2, 2019).

[19] E-Poll Market Research, *How Do Brands Survive a Crisis?* (May 13, 2019), *available at* https://blog.epollresearch.com/2019/05/13/how-do-brands-survive-a-crisis/.

[20] *See* Rooney, P., and Smith, J., *The Impact of Highly Publicized Campus Scandals on College Outcomes*, Contemporary Economic Policy, Mar. 18, 2019, *available at* https://onlinelibrary.wiley.com/doi/full/10.1111/coep.12427 (concluding that "scandals with significant media coverage substantially reduce applications" and that scandals covered in long-form news articles lead to a 10 percent drop in applications, with greater media coverage precipitating more substantial declines).

For USC, which received approximately 64,000 applications for admission in 2018, with an associated fee of $85 per application, a 10 percent decline in applications would translate to a loss of more than $540,000 in application revenues per year.  Likewise, for Georgetown, a 10 percent decline in applications would cause a loss of more than $170,000 per year.[21]  *See* U.S.S.G. § 2B1.1 cmt. n.3(C)(v) (in estimating loss, courts must consider the "reduction that resulted from the offense in the value of . . . other corporate assets").  Indeed, even if the study's results overstate the decline dramatically, the point is clear:  it is reasonably foreseeable that the universities will suffer a cognizable loss from the fraud.

While pecuniary harm for Guidelines purposes does not include "harm to reputation" *per se*, U.S.S.G. § 2B1.1 cmt. n.3(A)(iii), the Guidelines provide that "reasonably foreseeable pecuniary harm" *does* include pecuniary harm "that the defendant knew or, under the circumstances, reasonably should have known, was a *potential* result of the offense."  *Id.* cmt. 3(A)(iv) (emphasis added).  Moreover, probable loss is cognizable for sentencing purposes.  *See United States v. Vrdolyak*, 593 F.3d 676, 681 (7th Cir. 2010); *United States v. Corrigan*, 273 F. App'x 15, 16 (2d Cir. 2008) ("We have described 'intended loss' as 'the probable loss from a particular misstatement because one is presumed to intend the natural and 'probable' consequences of one's acts.'") (quoting *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000)).  Here, the loss

---

[21] Mackovich, Ron, *USC sees record number of applicants for fall 2018 admission*, USC NEWS (March 23, 2018), *available at* https://news.usc.edu/139338/usc-acceptance-rate-fall-2018-admission/ (USC received 64,000 applications in 2018); USC Dornsife College of Letters, Arts and Sciences, Freshman Application Process, *available at* https://dornsife.usc.edu/undergraduate-application-process/ (last accessed Sept. 4, 2019) ($85 application fee for USC); Kahn-Perry, Taylor, *Admissions Rate Falls to 14 Percent, Lowest in University History*, THE HOYA (April 5, 2019), *available at* https://www.thehoya.com/admit-rate-falls-14-percent-lowest-university-history/ (Georgetown received 22,788 applicants in 2018); Georgetown University Office of Undergraduate    Admissions,    First    Year    Application,    *available    at* https://uadmissions.georgetown.edu/applying/first-year-application/ (last accessed Sep. 4, 2019) ($75 application fee for Georgetown).

of application-related revenue is a foreseeable result of the defendants' conduct, and the Court

need not wait for that harm to actually occur to take it into account at sentencing.

## II.     THE TESTING AGENCIES SUFFERED PECUNIARY HARM

Like the universities, the College Board, Educational Testing Service ("ETS") and the

ACT, Inc. have suffered pecuniary harm from the lost wages they paid to their corrupt proctors,

the cost of their internal investigations, the cost of strengthening their security practices in direct

response to the defendants' conduct, the lost revenue resulting from a decline in the number of

students taking those exams, and the decline in the value of their intellectual property.  The

agencies acknowledge these losses in individual victim impact statements they have submitted to

the Court.

Moreover, in the weeks and months after the fraud was publicly disclosed, numerous

universities announced they will no longer require applicants to submit standardized test scores as

part of their applications, resulting in decreased revenue for the testing agencies.  For example:

| College/University | "Test Optional" Announcement | Last Year Applicant Pool |
|---|---|---|
| University of Minnesota - Crookston | March 18, 2019 | 1,297 |
| University of Denver | March 19, 2019 | 20,475 |
| University of San Francisco | March 27, 2019 | 18,411 |
| Springfield College | March 28, 2019 | 3,367 |
| Southwestern University | April 1, 2019 | 4,551 |
| Alma College | April 17, 2019 | 4,765 |
| Simpson College | April 18, 2019 | 1,401 |
| University of Southern Maine | May 22, 2019 | 4,254 |
| Marquette University | June 10, 2019 | 15,574 |
| University of Rochester | June 12, 2019 | 21,255 |
| Dominican University of California | July 15, 2019 | 1,909 |
| University of New Haven | August 5, 2019 | 10,426 |
| Spring Hill College | August 8, 2019 | 8,587 |
| Carroll College | August 12, 2019 | 2,709 |
| Queens University of Charlotte | August 18, 2019 | 2,419 |
| College of Our Lady of the Elms | August 20, 2019 | 1,085 |

| (except School of Nursing) | | |
|---|---|---|
| Xavier University | August 23, 2019 | 15,100 |
| Colorado College | August 28, 2019 | 8,552 |
| **TOTAL** | | **146,137** |

While it is difficult to attribute any one of these decisions directly to the fraud scheme, California state officials did just that in introducing legislation to eliminate the use of standardized tests by the state's two public university systems.  In introducing the legislation, its author noted:

> [R]ecently, it was uncovered that wealthy parents are buying their children's way into elite colleges and universities including two universities that are part of the University of California system.  We all watched in complete disgust as the fraud committed in this recent college admissions scandal unfolded.  California seems to be the epicenter of the national scandal as 25 of the 33 families in the initial indictment are from California, and 10 of the 17 corrupt coaches and university officials were based at California colleges and universities.

> This scandal not only undermines the public's trust in the college admissions process, but it further perpetuates the opportunity gap in our college system.  Equally disturbing is the fact that qualified California students were undoubtedly squeezed out and denied admission.  For every student admitted through bribery and fraud, there was an honest and talented student that was rejected.

> The scandal also shed light on the many legal ways that wealth and social connections skew the college admissions process.  This scandal, "Operation Varsity Blues," and the subsequent investigation resulted in dozens of bribery and fraud charges against wealthy parents willing to break the law to get their children into an elite university, including fraudulent testing practices with the SAT and ACT tests.

Calif. Bill No. ACR-64, Comments at p. 2-3.  As of September 4, 2019, the bill had passed the California State Assembly and was pending in the California State Senate.

In 2018, more than 800,000 students applied to the California State University and University of California systems alone.[22]  As a result, the College Board, ETS and the ACT can expect a significant decline in the number of applicants taking the SAT and ACT tests, and the loss of associated registration fees.  In 2019, those fees were $52.00 and $49.50 per exam,[23] respectively, for the ACT and the SAT, in addition to fees the agencies charge for sending test scores to schools, expediting scores, late registration, changing test centers, and selling test preparation materials.[24]

These lost revenues are precisely the type of "reduction in the value of [proprietary] information" resulting from the offense that the Guidelines provide should be included in the calculation of pecuniary harm.  *See* U.S.S.G. § 2B1.1 cmt. n.3(C)(ii); *see also id.* n.3(C)(v) (in estimating loss, courts must consider the "reduction that resulted from the offense in the value of . . . other corporate assets").

---

[22] Specifically, the California State University system had 637,350 "First Time Freshman" applications, *see* Press Release, Cal. State System, CSU New Students Applications and Admissions By Campus and Student Level (Dec. 14, 2018), *available at* https://www.calstate.edu/as/stat_reports/2018-2019/apps_f2018_all.htm, while the University of California system had 181,918 applications, *see* Press Release, UC System, Freshman Applications by Campus and Residency, *available at* https://www.ucop.edu/institutional-research-academic-planning/_files/factsheets/2019/fall-2019-applications-table-1-1.pdf.

[23] These figures reflect the lowest possible fee associated with taking the exams. *See, e.g.*, ACT, Inc., Current ACT Fees and Services, *available at* https://www.act.org/content/act/en/products-and-services/the-act/registration/fees.html (last accessed Sep. 4, 2019); College Board, Fees, *available at* https://collegereadiness.collegeboard.org/sat/register/fees (last accessed Sep. 4, 2019).

[24] *See, e.g.*, Jack Meserve, *The SAT May Have Been Changed To Help The College Board Maximize Revenue*, THE MOTLEY FOOL, Mar. 7, 2014, *available at* https://www.businessinsider.com/the-sat-may-have-been-changed-to-help-college-board-maximize-revenue-2014-3 ("The details of the College Board's revenue stream aren't publicly available, but SAT administration and all of its related paraphernalia—The Official SAT Study Guide with DVD ($31.99), the SAT Score Verification Services ($18), the SAT Online Course (just $69.95 a year!)—surely make up a sizable portion. Chadwick Matlin of Slate.com conservatively estimated this combined revenue at around $115 million back in 2006.").

### III.     **THE STIPULATED GAIN/LOSS IS APPROPRIATE AND REASONABLE**

All of the defendants have stipulated that their offense levels should be enhanced, pursuant

to the table in Section 2B1.1(b) of the Sentencing Guidelines, based on the sums they paid to

participate in the fraud scheme.  Such an approach is appropriate where the precise amount of

pecuniary harm caused by the scheme is difficult or impossible to calculate (not least because, as

noted above, that harm is still occurring), and it is also consistent with the way in which various

provisions of the Sentencing Guidelines treat bribe payments generally.

Indeed, while the plea agreements in this case stipulate that the Guidelines should be

calculated based on Section 2B1.1, the First Circuit and at least *four* other circuits have in similar

circumstances applied Section 2B4.1, the commercial bribery guideline, to private sector honest

services fraud cases, regardless whether those cases were charged pursuant to 18 U.S.C. § 1346.

*See, e.g.*, *United States v. Josleyn*, 99 F.3d 1182, 1198 (1st Cir. 1996) (applying § 2B4.1 where

defendant convicted of conspiracy and mail fraud for conspiring to defraud his former employer

by accepting bribes from prospective Honda dealers in exchange for dealership rights).[25]  Notably,

Section 2B4.1—which has a slightly higher base offense level—instructs courts to refer back to

---

[25] *See also, e.g., United States v. Rybicki*, 38 F. App'x 626, 633 (2d Cir. 2002) (affirming sentence under § 2B4.1 where defendant convicted of honest services fraud); *United States v. Montani*, 204 F.3d 761 (7th Cir. 2000) (same); *United States v. Winters*, 62 F.3d 1418, 1995 WL 462415 (6th Cir. Aug. 3, 1995) (unpublished) (same); *United States v. Kelly*, No. 17-cr-547001-RWS, 2018 WL 2411593, at *4 (S.D.N.Y. May 29, 2018) (unpublished) (same); *United States v. Hendershot*, 150 F. Supp. 2d 965, 968 (N.D. Ill. 2001) (applying § 2B4.1 where defendant convicted of mail fraud arising out of an illegal kickback scheme and noting that "[t]he government prosecuted this case as a bribery case"); *see also United States v. Poirer*, 321 F.3d 1024, 1035 (11th Cir. 2003) (applying § 2B4.1 where defendants convicted of wire fraud and conspiracy and noting, "[i]t is certainly true that accepting or providing bribes is inconsistent with the delivery of honest services, but that is not to say that the commercial bribery guideline cannot also be applied to a § 1343 money and property wire fraud case. The defendants' conduct in giving and receiving money in exchange for the misappropriation of documents is 'more aptly' covered by the commercial bribery guideline than by the fraud guideline.").

Section 2B1.1, and to apply an enhancement pursuant to the table set forth in that Guideline based on the greater of the amount of the bribe paid or the improper benefit conferred.

In *United States v. Tanner*, for example, the district court applied Section 2B4.1 in a private sector honest services fraud case in which the defendant, a pharmaceutical executive, received a kickback of nearly $10 million in exchange for giving secret guidance to senior executives at a mail-order pharmacy the defendant's employer was negotiating to purchase. *See* Transcript of Proceedings, No. 17-cr-00061-LAP (S.D.N.Y. Oct. 30, 2018) (Dkt. 214). In that case, the Probation Department agreed that Section 2B4.1 was the appropriate Guideline and the court enhanced the base offense level pursuant to the table in Section 2B1.1 based on the $10 million bribe the defendant received. *See id.*

More recently, in a case directly analogous to this one, former University of Pennsylvania basketball coach Jerome Allen was sentenced in July in the Southern District of Florida after pleading guilty to one count of money laundering under 18 U.S.C. § 1957, in connection with a scheme to accept bribes from co-conspirator Phillip Esformes in exchange for recruiting Esformes's son to the University of Pennsylvania basketball team. *See* Judgment, *United States v. Allen*, No. 18-cr-20773-KMW (S.D. Fla. July 8, 2019) (Dkt. 34). In that case, the parties' stipulated that the Guidelines should be calculated based on an underlying base offense level derived from Section 2B4.1(a), and that the offense level should be enhanced pursuant to Section 2B1.1 based on bribe payments of between $15,000 and $40,000. *See* Plea Agreement, *United States v. Allen*, No. 18-cr-20773-KMW (S.D. Fla. Oct. 3, 2018) (Dkt. 10). At Allen's sentencing, the district court applied Section 2B4.1 and sentenced him under that Guideline, but found that the

bribe amount was higher—between $150,000 and $250,000—and enhanced the offense level accordingly.[26]

Like Section 2B4.1, Section 2C1.1, which applies to public-sector honest services fraud, provides for an enhancement pursuant to the table in Section 2B1.1 based on the greater of the value of the bribe or the improper benefit conferred in exchange. *Compare* U.S.S.G § 2C1.1(b)(2) ("if the value of the payment, the benefit received or to be received in return for the payment . . . whichever is greatest, exceeded $6,500, increase by the number of levels from the table in § 2B1.1") *with* U.S.S.G. § 2B4.1(b)(1)(B) ("If the greater of the value of the bribe or the improper benefit to be conferred . . . exceeded $6,500, increase by the number of levels from the table in § 2B1.1.").[27]  Although Section 2C1.1 typically applies to bribery involving public officials, it also applies to convictions under 18 U.S.C. § 666(a)(2), which criminalizes fraud and bribery schemes at organizations or agencies that receive more than $10,000 per year in federal benefits.[28]  As an example, in the Jerome Allen case referenced above, Allen's co-conspirator, Phillip Esformes, was convicted after trial of conspiracy to violate Section 666(a)(2) arising out of his payment of bribes to Allen, an employee of the University of Pennsylvania.  *See* Jury Verdict, *United States v. Esformes*, No. 16-cr-20549-RNS (S.D. Fla. April 5, 2019) (Dkt. 1245).  Although Esformes's sentencing has not yet occurred—the hearing is scheduled for September 11 and 12—the U.S.

---

[26] The court sentenced Allen to probation based on his cooperation with the government at Esformes's trial.

[27] Section 2C1.1 carries a higher base offense level than either Section 2B1.1 or 2B4.1. S*ee Josleyn*, 99 F.3d at 1199 n.15 ("One reasonable explanation for the two-level difference between the BOL for private bribery, *see* U.S.S.G. § 2B4.1 (level 8), and public bribery, *see* U.S.S.G. § 2C1.1 (level 10), may lie in the fact that the Sentencing Commission factored the abuse-of-trust element into the BOL for public bribery only.").

[28] Although the defendants here were not charged pursuant to Section 666, the victim universities receive more than $10,000 per year in federal assistance.

Probation office in the Southern District of Florida has calculated his offense level pursuant to Section 2C1.1, with a base offense level of 12 and an enhancement based on the amount of the bribe paid.

Accordingly, enhancing the defendants' base offense level based on the value of the bribe and related payments is consistent with the way in which the Guidelines treat bribe payments generally, and would align the defendants' Guidelines ranges in this case with those of similarly situated defendants nationwide. Measuring harm based on the value of the bribes or the improper benefits conferred is also consistent with the purpose of the Guidelines generally to appropriately reflect the defendants' absolute and relative culpability and to achieve a just result. By contrast, the PSR's conclusion that the bribe amount has no impact on the calculation of the Guidelines means that a defendant who pays a $10 million bribe will have the *same* offense level as a defendant who pays a $10,000 bribe, and that a defendant who commits a fraud that causes pecuniary harm of $6,501 will have a *higher* offense level than a defendant who pays a $65 million bribe. The government respectfully submits that such an approach is neither logical nor just.

17

## **CONCLUSION**

For the reasons set forth above, the government respectfully submits that the Court should find that the victim universities and testing agencies have suffered pecuniary harm from the defendants' fraud, and that the applicable Guidelines levels should be enhanced pursuant to Section 2B1.1 based on the amounts the defendants agreed to pay to facilitate the scheme, as stipulated in the plea agreements.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney


By:      */s/ Eric S. Rosen*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant United States Attorneys

Date: September 5, 2019