# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )   Case No. 1:19-cr-10117-IT
            v.                          )
                                        )
AGUSTIN FRANCISCO HUNEEUS,              )   Leave to File Granted on
                                        )   September 25, 2019 – Dkt. No. 485
            Defendant.                  )
_____ )

### SENTENCING MEMORANDUM OF AGUSTIN FRANCISCO HUNEEUS

Defendant Agustin Francisco Huneeus ("Agustin") respectfully submits this Sentencing

Memorandum in connection with his sentencing scheduled for October 4, 2019.

## I.   INTRODUCTION

Agustin Francisco Huneeus' life has been one of devotion to family, professional

endeavor and accomplishment, and civic and community engagement.  The criminal offense, for

which he early on took responsibility and pled guilty, is wholly out-of-step with the person he

has been and continues to be.  Agustin regrets, daily, the bad decisions he made that have led to

his conviction, and has done his best to take responsibility for them and use them as a source of

personal growth and renewed commitment to his family, friends and community.  In his own

words in his letter to the Court:

> I am looking forward to my sentencing so I can start to put this behind me. I want
> to pay my dues and feel clean again. This has been the most consequential
> experience I have ever had to overcome and it is self-inflicted. I know this
> experience will define the rest of my life and it's up to me whether it will define
> me in a good or bad way. During the past months I have day-dreamed about giving
> up and moving to a different place so I don't have to confront the shame I feel when
> I run into someone I know here. But for the sake of my daughters and my wonderful
> and supporting wife I know I have to come back from this. I will use this

cataclysmic event to work on myself and to come back stronger. I will work harder than ever to improve the lives of those I have harmed and atone for my crime so that I can regain my dignity and be worthy of the respect of my friends and family again.  (Letter from Agustin Francisco Huneeus, pp. 2–3).[1]

Of all the parents who early on pled guilty and took responsibility for their crimes, the government seeks the longest term of imprisonment for Agustin.  Yet, the central theme of this entire prosecution was to highlight how illegal actions of parents resulted in "taking a spot" at a school from someone more deserving.  As the government stated in its sentencing brief for Devin Sloane, "[c]ollege admissions is a zero-sum game."  Dkt. No. 455, p. 16.  But, Agustin's daughter was never ultimately admitted to USC and did not, therefore, "take" any spot in this zero-sum game.  This factor alone merits a sentence far below that which the government has recommended, and one below that of parent defendants who did secure a spot for their children.

We also urge the Court to view Agustin's life as a whole, and to fashion a sentence that takes into account not only his crime, but also the person he has been long before this case, and the person he is and will be long after it.  We therefore recommend a sentence of two months of imprisonment, followed by one year of supervised release, including as a special condition performing 350 hours of community service, and a fine of $95,000.

As set forth in greater detail below, this is a sentence that is consonant with the Section 3553 factors and one that will significantly punish him, though not more so than is necessary.  It is also consistent with the government's theme that it is not the amount of imprisonment that is important, but rather the fact of it, a theme that this Court recognized in the Wang case.[2]  *See United States v. S. Wang*, Case No. 16-cr-10268-IT, Disposition, Dkt. No. 360, 52:15–22 (D.

---

[1] Agustin's letter and letters in support are filed herewith as Exhibit A (with their own table of contents).
[2] Though this recommended sentence includes a period of incarceration, it is thematically consistent with Amendment 811 to the United States Sentencing Guidelines (November 1, 2018), which states that courts should consider imposing a sentence other than imprisonment for defendants such as Agustin, namely nonviolent first-time offenders in Zone A or B of the Sentencing Guidelines Table.

Mass. Nov. 28, 2018) ("The government asks:  What would be enough?  What would deter people?  . . .  I think the humiliation, and I think any period of incarceration in this circumstance would certainly send the message to not do what you have done here.").

As set forth in more detail below, other than his involvement in this case, Agustin has led a law-abiding and exemplary life.  Some of the letters submitted on his behalf are unique and especially notable as they highlight Agustin's willingness to help others in a variety of ways from providing financial assistance, to being a source of emotional support during difficult times, to rolling up his sleeves and providing hands-on assistance.  A number of the letter writers are immigrant employees at the vineyard that Agustin formerly operated, and they attest to Agustin's personal commitment to their welfare and professional development.  It bears mention that Agustin's good acts and deeds recounted in the letters were undertaken long before the glare of this case.  The letters reveal the true and decent person Agustin is.

## II.  BACKGROUND ON AGUSTIN FRANCISCO HUNEEUS

Agustin was born in Chile in 1966.  When he was six years old, his family fled Chile due to political turmoil.  The family lived in Argentina for over a year, and then moved to the United States, initially settling in New York.  A few years later, when Agustin was 11 years old, his family moved to California, where they have lived for the last 40+ years.  In 1991, Agustin became an American citizen.

In 1977, Agustin's parents, with Chilean partners, started in the wine business in California; farming vineyards, making and selling wine.  His father was president of the fledgling company and his mother, a microbiologist and viticulturist with a doctorate from Columbia University, worked the agricultural side of the business.  Agustin and his sister, now a law professor at the University of Wisconsin, grew up working odd jobs in the wine business.

Huneeus Vintners is known for making quality wine that respects the earth from which it comes and the people who make it.

Agustin earned a B.A. from the University of California – Berkeley in 1989, and later an M.B.A. from Northwestern University in 1996. By 1998, the pull of the family's involvement in vineyards and the wine business led Agustin to join his parents and their partners. During this time, he started a family with his wife Maca, who he met in Chile. They were soon raising four daughters. At the winery, he learned the business from the ground up, working with everyone from the farmworkers to the senior heads of operation. When this business was sold to a public company, Agustin stayed on, working for the buyer and heading the newly formed fine wine division. Eventually, he left that role and took over his family's new wine business. In the wine business, Agustin found a profession about which he was passionate, one that blossomed into his only real career, and one in which he could and did succeed. He found success in a traditional sense (growth, management, sales and acquisitions), but also in other senses (relationships with colleagues, with employees, including Spanish-speaking immigrants with whom he identified and often sought to mentor and promote).

Based on his plea in this case, and due to state and federal restrictions against felons holding alcoholic beverage licenses, Agustin has already given up managing his wine business and faces a future without involvement in the licensed wine business for years to come.[3] This is an enormous personal loss, of course not only of livelihood, but also of the involvement in the only industry he has really ever known. The collateral consequences to Agustin of the loss of his

---

[3] The California Business and Professions Code § 24200(d) provides as grounds for the suspension or revocation of alcoholic beverage licenses the "plea, verdict, or judgment of guilty, or the plea of nolo contendere to any public offense involving moral turpitude . . .." *See also* 27 C.F.R. § 1.24 (federal alcohol licensure requires that the "person (or in case of a corporation, any of its officers, directors, or principal stockholders) has not, within 5 years prior to the date of application, been convicted of a felony under Federal or State law . . ..").

ability to be licensed and to manage his own wine business is a serious punishment he has already had to endure, and he faces long years ahead in which he will be barred and will have to find and build a new livelihood.[4]

However, while this case has been the source of familial pain, professional loss, and shame and embarrassment, Agustin has made great efforts to avoid wallowing, and instead has moved forward to try to heal and repair that which he has harmed.  As set forth in greater detail below, he has continued, and in fact deepened, his community service activities, and taken steps to rebuild his relationships with those he loves.

## III.    LEGAL ARGUMENT AND FACTUAL SUPPORT

While the Court must consider the Guidelines calculation as part of the sentencing process, its sentence ultimately hinges on the sentencing factors set forth in 18 U.S.C. § 3553.  *See Kimbrough v. United States*, 552 U.S. 85, 100–02 (2007); *United States v. Martin*, 520 F.3d 87, 91, 96 (1st Cir. 2008).  Indeed, the Court "must make an individualized assessment based on the facts presented."  *Gall v. United States*, 552 U.S. 38, 50 (2007).

In the end, the Court's sentencing determination is limited by the Congressional mandate in 18 U.S.C. § 3553(a) that sentencing judges are required to fashion sentences which are "sufficient, but not greater than necessary, to comply with the [statutory] purposes" of sentencing, as set forth in subsection (a)(2).  The Congressional mandate, often referred to as the "parsimony principle," limits the sentence a court may impose.

As this Court is keenly aware, this case presents a somewhat unique set of Guidelines issues.  Specifically, Agustin entered into a Plea Agreement that recites a "loss" and a Guideline range under U.S.S.G. § 2B1.1.  In Agustin's case, the government agreed to recommend 15

---

[4] There may be opportunities for Agustin in years to come to reapply for an alcoholic beverage license, but the earliest possible time frame would be five years from his date of conviction.

months, a 6-month variance below the low end of the Guideline range set forth in the Plea

Agreement (which was 21–27 months).  The Plea Agreement explicitly states that the Court is

not bound by these calculations.  The U.S. Probation Office concluded that there is no loss in

connection with any of the parents who have pled guilty (testing or admission) and that the

appropriate Guideline range for Agustin is 0 to 6 months (Zone A).  By its Memorandum and

Order of September 13, 2019 (Dkt. No. 443), the Court also found that this was the appropriate

Guideline range for each of the pleading parents, and observed that this "does not end the inquiry

[and] [t]he final sentence will be determined with consideration of all the factors set forth at 18

U.S.C. § 3553(a)."  Under such an analysis, the government's recommendation is grossly

excessive, as it calls for a nine-month upward variance and a sentence that is two-and-a-half

times the upper end of the applicable Guideline range.  It is also nearly four times the sentence

the Court imposed on similarly situated defendants (Devin Sloane and Stephen Semprevivo).

The two-month imprisonment sentence recommended here is consistent with the

Guidelines and, as set forth below, the statutory sentencing factors.

> A.    The Nature and Circumstances of Agustin's Offense
> Support a Sentence Well Below the 15 Months Sought by the Government.

The Court must consider the "nature and circumstances of the offense" in determining the

sentence to be imposed.  18 U.S.C. § 3553(a)(1).  The offense here centers on an effort to secure

admission to USC for his daughter by deceptive means.  A considered analysis of this factor

supports a sentence within the 0 to 6 month Guideline range applicable to this case.

The government in its Consolidated Sentencing Memorandum (Dkt. No. 423, pp. 22–26)

sets forth six factors relating to the offense in all these cases that, in its view, bear on the

sentencing:  (1) Amount of the Bribes; (2) Repeat Players; (3) Active Versus Passive

Participation; (4) Involvement of Children; (5) Positions of Trust; and (6) Other Conduct.  It

bears repeating that at the core of this case from the government's perspective has been this usurpation of an admission spot. Yet, unlike the other pleading parents who participated in the admissions scheme, Agustin's daughter was never ultimately admitted, and did not take a spot from another student.

<u>The Amount of the Bribes</u>

The government argues that because Agustin paid $50,000 to Singer's foundation (KWF) in connection with the SAT scheme, paid $50,000 to a USC account in connection with the admission scheme, and agreed to pay another $200,000 after his daughter was ultimately admitted to USC, he deserves the longest prison sentence of the pleading parents.

There are a number of flaws with that analysis. For starters, the amounts Singer charged for the same "services" were highly variable. More importantly, Agustin only actually paid $100,000 ($50,000 to Singer's foundation and another $50,000 to USC). He never paid the additional $200,000 that he had agreed to pay Singer if and when his daughter was admitted to USC.

Due to the timing of the charges, his daughter was never ultimately admitted to USC, thus she never "took a spot" from some other more deserving applicant. In turn, Agustin never paid to Singer's foundation the remaining $200,000.

The government argues that Agustin should get no credit for the serendipity of the charges being brought before his daughter was ultimately admitted to USC. Yet, whatever the timing, the fact remains that his conduct did not result in any spot being taken from some otherwise deserving student. This stands in contrast to the conduct of a number of the other pleading parents, and undermines the government's harsh sentencing recommendation given the central theme of this prosecution revolves around wrongfully "taking" a spot. Second, as is clear

from the recordings made by Singer once he became a cooperator, Agustin was never 100% sold

on USC for his daughter, and continually pressed Singer about his daughter's interest in and

applications to a number of other schools, thereby undermining a notion that USC was

necessarily a sure thing on either side.  In fact, his daughter applied to nearly a dozen other

schools after receiving a conditional acceptance from USC in November 2017, and attended a

semester long program at one of those schools during the spring of her senior year in high

school.  In short, even if she had been ultimately admitted to USC, it was not clear that was

where she would attend.  This situation is actually akin to the happenstance for which the former

Stanford sailing coach (Vandemoer) received leniency at his sentencing because none of the

students he recommended for admission to Stanford ended up taking a spot, but only because

they decided to attend or apply to other schools.  Vandemoer and Agustin, due to serendipity,

engaged in conduct that did not result in a spot being taken.  Both should receive consideration

of that fact.

        Repeat Players

        The government also contends that Agustin deserves harsher punishment because he

participated in both the SAT and admissions frauds.  While true that he participated in both, his

relationship with Singer began with neither.  In fact, Agustin hired Singer as a college counselor

for his daughter because Singer was referred by an upstanding college friend.  The first several

months of the relationship with Singer involved only completely legitimate college counseling

such as SAT tutoring, essay discussion and editing, and formulation of lists of schools to which

to apply.  Unlike some other parents, Agustin did not seek Singer out to engage in a fraud.

        Over time, the relationship shifted.  Singer suggested, and Agustin regrettably accepted,

fraud to further his daughter's admission prospects.  While in no fashion an excuse, but merely

as context, it is worth noting that Singer is a clever con man, preying on the insecurities of not only the parents, but also their children.  In the case of Agustin's daughter, he told her that without his "help" she had no realistic prospects.  Her mother's letter to the Court described the psychological torment that Singer inflicted on her daughter.  Ultimately as the Court knows, Agustin participated in both the SAT and admission schemes presented by Singer, though conceiving them as part of one common, fraudulent effort to advance his daughter's interests.

Active Versus Passive Participation

The government cites this factor in its Consolidated Sentencing Memorandum and considers in that factor "steps taken independently to advance the fraud and conceal it."  Dkt. No.  423, p. 24.  Agustin certainly engaged in the fraud scheme, but did not take the aggravating steps that the government has described as active participation, such as purchasing water polo equipment and staging photos.  In fact, his daughter was really a high school water polo player.

Also, it is worth noting that Agustin's daughter had long-standing diagnosed learning differences, had received extra time on standardized tests as early as the eighth grade, and that her need for extra time on the SAT was real and not manufactured at Singer's suggestion.

Involvement of Children

The government asserts that "[s]tiffer sentences are appropriate for defendants who enlisted their children in the scheme" and claims that Agustin informed his daughter about the cheating scheme.  Dkt. No. 423, pp. 24–25.  Yet, this meeting with Singer in October 2018, which was recorded because it was after Singer became a government cooperator, was well after Singer, not Agustin, had informed Agustin's daughter about the scheme.  Singer told her about the scheme on his own and outside the presence of Agustin before she took the SAT in early 2018.  In addition, the circumstances of the test only confirmed what Singer had told her,

namely, there were no identification requirements, students were allowed to keep their cell phones, bathroom breaks could be taken at any time, and time was not strictly kept.

Moreover, by the government's own logic, the defendants who deceived their children by keeping them in the dark about the scheme are condemned (Dkt. No. 423, p. 24), as are the ones whose children learned of the scheme from Singer directly (as Agustin's daughter did) or who directly told their children of it.  The fact that the government argues both sides of the issue illustrates that this is not a factor that should carry significant weight, and even if it does, it was not Agustin who disclosed the scheme to his daughter.

Positions of Trust

The government asserts that it "considered the extent to which the defendants occupied positions of trust in the community."  Dkt. No. 423, p. 25.  By reference to this factor, the government seems to be arguing for a form of enhancement akin to the one in the Guidelines for Abuse of Position of Trust or Use of Special Skill (U.S.S.G. § 3B1.3).  However, that enhancement is not applicable in this case, and in fact the government did not seek it.  Any effort to apply it to Agustin must fail, particularly because the Guideline itself requires a connection between the crime and the position of trust.  *See* Application Note 1 ("For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense. . ..").  That did not occur here and this factor is not applicable to this case.

Other Conduct

The government's brief comments that it "considered the defendants' conduct as the scheme unraveled and following its exposure, ranging from public expressions of post-arrest contrition at one end to defiant efforts to retain the benefits of the fraud at the other …."  Dkt.

No. 423, p. 25.  Agustin stands on the correct end of this spectrum.  He nearly immediately took responsibility for his actions, agreeing to plead guilty within weeks of being charged.  On the day of his guilty plea, he issued a public statement that expressed contrition and remorse.  Since then, he has not hired experts (psychologists, criminologists or others) to explain or contextualize his conduct.  Instead, he has gone about the hard work of trying to make amends for what he did.

A considered analysis of all of these factors does not support that Agustin is deserving of the most severe punishment of the pleading parents, and certainly not the 15-month sentence recommended by the government.  Rather, an analysis of the sentencing factors counsels in favor of a two-month sentence of imprisonment.

B.    Agustin's Personal Characteristics Warrant the Proposed Sentence.

Under 18 U.S.C. § 3553(a), the Court must consider "the history and characteristics of the defendant," among other factors, in forming an appropriate sentence.  Agustin's crime is fundamentally at odds with his character.  The letters in support of Agustin show that he: (1) cares for the people with whom he works, particularly their well-being and career development; (2) donates substantial time, effort and money to the community; and (3) is a devoted, loving and supportive husband, family member and friend.

1. *Agustin is a Valuable Member of the Napa Business Community and a Supportive Employer.*

Agustin has deservedly earned the respect of the Napa business community over the last several decades.  Importantly, this respect comes equally from business leaders and farm workers.  The letters in support demonstrate that the respect is borne out of behaving honorably and ethically.

- Martín Galván, who has known Agustin's family since 1990 and started working for Huneeus Vintners in 1998, recounted numerous instances of Agustin caring for his employees as

well as assisting in times of great need during fires, floods and earthquakes.  In connection with

Agustin's actions during the 2017 floods in Napa, he stated:

> In 2017 we experienced serious floods and mud slides in the vineyards. Agustín Francisco worked with us shovel in hand throught the night hours to help control the flooding. For the workers to see the boss working on a par with them was touching, an unforgettable gesture of solidarity.

> That same year during the harvest we had a great fire in Napa, the valley was surrounded by flames. Agustín Francisco came to the vineyards to be with us and made sure that we were well and that we had the necessary equipment to protect ourselves from the fire. … Agustín Francisco is constantly preoccupied with the safety of the workers. He is always in direct contact with us and makes us share in the successes of the business. We are very proud of our work and our boss.  (Letter from Martín Galván, p. 2 [translated from original]).

- <u>Maria Alvarez</u> has known Agustin since 2004, which is when she started working for his

parents as a housekeeper in San Francisco.  In 2006, she began working directly for Huneeus

Vintners as a housekeeper.  Ms. Alvarez is currently the Principal Chef and Planning Assistant

for events held at one of the family wineries.  Agustin has made it a priority to elevate

employees, like Ms. Alvarez, within his organization.  Indeed, Ms. Alvarez stated:

> I am very grateful to him for he has given me the unique opportunity to learn and to grow within the company. For me working [for Huneeus Vintners] has been the equivalent of going to college, it has given me the education and the opportunities that I didn't have growing up. … A few months ago Agustin Francisco offered me the position of organizing all of the events at Huneeus Vineyards, but I declined this offer because I felt I was not prepared for that position since I am not fluent in English and lack the necessary computer skills. Agustin kindly told me that he was going to help me be trained for the position.  I feel that only a very generous and kind boss has that kind of caring for his employees.  (Letter from Maria Alvarez, p. 1 [translated from original]).

As <u>Armando Rosales</u>, one of his previous employees, stated: "I know Agustin Francisco

well; he is a noble and humble person who has helped me. He is always worried about the

wellbeing of his employees and planning how to improve their lives."  (Letter from Armando

Rosales, p. 1 [translated from original]).

- <u>Mark Couchman</u> has known Agustin for the past twenty years as a colleague in the Napa and Sonoma Valley wine industry.  His letter attests to Agustin's honesty and also reflects Agustin's respect and support for the workers in the community:

> In my business dealings with Agustin, he has always acted with forthrightness and integrity. He is honest and trustworthy. I have been in business meetings with Agustin and his employees. He respects and listens to their opinions and carefully guides them towards improvement.  (Letter from Mark Couchman, p. 1).

- <u>Richard Sands</u>, the Executive Vice Chairman of Constellation Brands who has known Agustin for 20 years on a personal and professional level, further discussed the care that Agustin demonstrates for his co-workers and other farmworkers in Napa Valley:

> I have also seen Agustin demonstrate the highest level of caring for the hundreds of people who work with and for him. His bilingual ability along with tremendous respect for all workers has led to a great culture within the organizations that he leads with bilingual employee meetings and getting the whole organization involved.  An example of this is that Agustin convinced our company to provide English as a second language classes, computer classes and math classes to our farmworkers and hourly employees so that they could get the skills they need to advance their careers. Some of the employees that benefited have since been promoted to managerial roles.  (Letter from Richard Sands, pp. 1–2).

Besides his caring for the well-being, safety and professional development of his employees, all who have known Agustin stress that he is a man of integrity, whose conduct in this case was an aberration, and not the conduct of the man they know.

- <u>Joe Rance</u>, a former employee who worked with Agustin from 2010 to 2018, stated:

> Having worked for many people in the industry I regularly said to peers that I learned more about the way to look at the business from him than anyone else I had worked for. We were regularly directed to do the right thing for the business. Meaning don't take shortcuts or find the easy way out through unsustainable business management. It always felt like we had integrity in the way we engaged in our sales practices.  (Letter from Joe Rance, p. 1).

<u>Richard E. Klein</u>, a colleague, stated: "[I]n my many business dealings with Agustin, he has only been honest, ethical and professional."  (Letter from Richard E. Klein, p. 1).  Similarly,

Vivek Paul, who knows Agustin through a professional organization, stated: "[H]e remains a terrific human, a straight shooter, and someone you can trust."  (Letter from Vivek Paul, p. 2).

- Rodrigo Soto Gelmi, a former Chilean employee of Agustin's, recounted Agustin's conduct during union negotiations:

> He was always concerned about how the people were doing, what they were asking, and making sure that we heard them. The company was in no position to finance their asks, yet he would always find ways of giving us additional resources to make sure that we would reach a fair agreement and that people would continue to work in a healthy and happy environment. In these negotiations the humanitarian aspect always prevailed the economic side, making the company be a role model for the wine industry and for the region. We got phone calls and emails from our competitors and neighbors questioning our decision making in this aspects, putting pressure on the executives to regulate the benefits and be less generous. Agustin never listen to them, he was way more interested in the moral and spirit of the team and the workers rather than what the rest of the industry may say about him.  (Letter from Rodrigo Soto Gelmi, pp. 1–2).

## 2. *Agustin is a Devoted Friend and Community Member.*

Agustin's life is marked by helping friends and family members in need.  He has done this for decades as a part of his value system.

- Nicolas Chadwick Quesney, Agustin's cousin, recounted an example of Agustin's generosity in helping him achieve his dream of becoming a pilot.  Mr. Quesney stated:

> My dream since early childhood was to be a pilot but sadly my family could not afford to pay for the long and expensive training. When I turned 17 Agustin Francisco, without me ever asking, offered to pay for my pilot training, generously giving me the chance to start my professional career. I am currently the Captain of Airbus 320 for Sky Airlines a Chilean airline, and I am also the Deputy Manager of Operations of this airline. I am responsible for over 200 pilots. I love my work and I will never forget that it all started with my cousin generous gift, and his clear understanding of the value of helping others, something he learned from his parents. (Letter from Nicolas Chadwick Quesney, p. 2).

- Marcela Luisa Rodríguez Ossa, a friend of Agustin's for the past 31 years, discussed Agustin assisting her in times of personal difficulty:

> Later on I separated from my husband and it is here where I will never be able to forget Agustin's kindness. He offered himself to be the intermediary between my lawyers and my then husband's lawyers so we could reach an agreement. No other friend made such an offer, but Agustin with incredible compassion and understanding of the situation gave his time and effort so that things would be equitable; his main concern was, of course, our children.  (Letter from Marcela Luisa Rodríguez Ossa, p. 2).

- <u>Andrés Wood</u>, a friend of Agustin's since 1982, described a similar sentiment and stated: "Many are those whom he has helped through troubled time not only financially but also by being a steady presence at their sides when facing difficulties. We are grateful and feel lucky to have had his company and his advise in difficult moments." (Letter from Andrés Wood, p. 1 [translated from original]).

### 3.  Agustin is a Loving Father and Husband and Family Member.

Almost all of the letters written in support of Agustin reference his commitment to and love for his family, and especially his four daughters, the youngest of whom is 12 years old.

- <u>John H. Lynch</u>, a teacher at a K-8 school in Marin County, has known Agustin for almost 40 years since they were in high school together.  They were roommates in college and participated in each other's weddings.  He noted Agustin's embrace of his role as a father:

> Agustin's compassion, commitment and deep connection to his family are deeply written in his DNA. Agustin undertakes his role as a father with candor and warm, abiding affection in a way that, in partnership with his wife Maca, anchors their daughters' lives.  (Letter from John H. Lynch, p. 2).

- <u>Jamie Gillan</u> began working for Huneeus Vintners in 2011 and is currently the Regional Vice President.  Agustin's commitment to his family translated to his interactions with his former business colleagues:

> His dedication to family goes deep and is instilled not only in his family but in his approach to how he treats the people in the company. One of the core tenets of the company is to "be the best family owned company in the fine wine business". He lives this value; I know; because he always asks how my family and kids are every

time we meet. A simple task but when it is asked with authenticity it means a lot. (Letter from Jamie Gillan, p. 1).

- Vivek Paul, an adjunct professor of radiology and founder and president of the Samarth Foundation, a non-profit that enables educational initiatives, has known Agustin for 15 years. To Mr. Paul, Agustin's love for his family is evident: "Above all, I saw the amazing love he has for his four daughters. … He spent hours with them, on their homework, on their activities, and traveling with them." (Letter from Vivek Paul, pp. 1–2).

Agustin's immediate family echoes these sentiments. His sister, Alexandra Huneeus stated in connection with his conduct that: "What has not changed, and will not change, is that Agustin is a devoted and involved father, and he cares deeply for his daughters." (Letter from Alexandra Huneeus, p. 1). His mother described that: "As an adult, Agustin Francisco's life has been consistent with the values we instilled in him. He is an amazing father, always concerned about his four daughters; he has a good marriage of 23 years; he is a caring and loving son and a compassionate human being." (Letter from Valeria Q. Huneeus, p. 1).

- Maca Huneeus, Agustin's wife, explained Agustin's deep commitment to his four daughters.

> Our girls have turned out the way they have in large part due to their amazing father. … He puts his all into his daughters; his time with the girls is truly sacred. Agustin has always preferred to stay in with them rather than attend any social engagement. His love and devotion have created the type of household where not only are our daughters around all the time, but even their friends find support and engagement in our home. Their friends come to visit Agustin to this day, even though our older girls are in college. His commitment to them shows in my daughters' personalities: they are confident, kind, and driven girls who all absolutely adore their father. (Letter from Maca Huneeus, pp. 1–2).

### 4. Agustin is Community and Civic Minded.

For his whole adult life, Agustin has engaged in community service. He has headed fundraising and relief efforts in the aftermath of a Chilean earthquake in 2010, the Napa

16

earthquake in 2014, and the Napa fires of 2017.  Agustin has also been a longtime supporter of

Olé Health, an organization founded in 1972 to provide healthcare to low-income Spanish

speaking workers in Napa Valley.  (*See* Letter from Andrew Erickson, p. 1).  And, Agustin's

efforts also go beyond financial contributions.

- <u>Armando Rosales</u>, who has worked with Agustin's family for 27 years since he

immigrated to the United States, stated:

> Agustin Francisco is a compassionate man who has helped me through several
> rough periods of my life. . . .  An example of Agustin Francisco solidarity with his
> employees is the incredible support he gave us after the 2014 earthquake. Not only
> did he help us economically, but he also gave us the necessary emotional support
> that enabled us to survive the loss of our mobile home.  In 2017 during the terrible
> Napa Valley fire Agustin Francisco stood by our side supporting us and minding
> our security and health and that of our families.  (Letter from Armando Rosales, p.
> 1 [translated from original]).

- <u>Todd J. Carter</u> has known Agustin for 16 years.  He also recounted Agustin's conduct

during the Napa fires:

> In October of 2017, a group of local business leaders were confirmed for an event
> in the Rocky Mountains.  When the Napa Valley fires broke out, Agustin cancelled
> his trip so that he would be able to help with the Napa evacuation, not only for his
> employees but families in the area as well.  Disregarding the risk to his business
> interests (the fires occurred during harvest time and unpicked grapes were at risk
> of being destroyed by smoke damage), Agustin focused on the safety and welfare
> of his employees, actively driving around the area and assisting those who had been
> evacuated with alternative housing options. He organized, sponsored and led the
> "Napa Valley Fire Relief" program, helping victims find medical support, shelter
> and food, and raising millions for relief efforts.  (Letter from Todd. J. Carter, p. 2).

- <u>Wences Casares</u>, a friend who has known Agustin for 10 years since he first moved to

San Francisco from South America, stated:

> He accepts who we really are, on our good days and our bad days. I have seen him
> be kind and generous to people who will never know he helped them. I was in
> California with Agustin when the 2010 earthquake hit Chile, I remember how
> devastated he was as news came in on how it had affected friends and family but
> above all else I remember how that same day he started working on a fundraiser to
> help the victims which was a success.  (Letter from Wences Casares, p. 1).

- <u>Martín Galván</u> recounted Agustin's actions after the Napa Earthquake of 2014, which at 6.0 was the largest earthquake in the San Francisco Bay Area in 25 years.  Mr. Galván described how Agustin reached out to offer support to his employees and also how he worked in the earthquake's aftermath to help rebuild the community:

> After the 2014 earthquake . . . Agustín Francisco immediately contacted me to know how extensive the damage was and to inquire if the workers houses had been affected. He asked me to inform everyone that if their houses were damaged he would help. He then instituted a fund to reconstruct the workers' homes that had been damaged.  In 2016 Agustín Francisco was named president of the Napa Valley Auction. We saw at a close distance how he organized a very successful event that gathered a large quantity of money for health care in the community, something from which we all benefited.  (Letter from Martín Galván, p. 1 [translated from original]).

- <u>Antonio J. Lucio</u>, Facebook's Global Chief of Marketing, who has known Agustin for eleven years, described Agustin's efforts in assisting the Napa and Chilean communities in response to devastating earthquakes and fire.  He stated:

> I have always been impressed by his ability to bring people together to achieve great things. After a terrible earthquake destroyed areas in Chile, Agustin stepped up and organized auctions to deliver needed help. He did not delegate the task; he personally made all calls and took personal care of all the details of the event. Agustin has also brought a defender of diversity to our community. As a firm believer in the benefits of biculturalism, he worked to ensure opportunities were always open to the Latino community. When earthquakes and fires affected the Napa areas, Agustin was there to open doors and help anyone affected. He is a committed and caring human being.   (Letter from Antonio J. Lucio, p. 1).

Since the conduct at issue in this case has occurred, Agustin has spent his days volunteering with two organizations: the Glide Foundation and the Napa Valley Farmworker Foundation.  The Glide Foundation is a spiritually based social service organization providing necessary services to the most vulnerable people in the San Francisco community.  Agustin volunteers in the kitchen preparing and serving meals.

Jean Cooper, the Chief of Staff of the Glide Foundation, an organization that helps poor and homeless people in San Francisco, wrote about Agustin's "deep commitment" to the program, volunteering 2–3 times a week to prepare and serve meals, and helping with a "new strategic initiative to help women and families of color stabilize their lives and reach economic independence.  Agustin has been a great resource across the organization and we truly appreciate his energy, creativity and his ability to roll up his sleeves and get the work done."  (Letter from Jean Cooper, p. 1).

The Napa Valley Farmworker Foundation promotes vineyard workers through education and professional development.  In connection with the Napa Valley Farmworker Foundation, Agustin helped develop and facilitate this year's Field of Opportunity internships for 22 high school students, which exposes them to, and gives them experience with, various career opportunities in the wine industry.  Agustin participated in developing this year's program by strengthening a skills program to train students on skills that are essential in the workplace, by training students at their winery and by speaking and bringing in others for the career days he helped organize.

Agustin's impactful and continued service to the community should be considered by the Court when fashioning a sentence.  *See, e.g.*, *Rita v. United States*, 551 U.S. 338, 364–65 (2007) (Stevens, J., concurring) (noting that a sentencing judge may consider public service under § 3553(a)).

As part of the sentence sought here is a special condition requiring Agustin to perform 350 hours of community service, ideally at the Glide Foundation and the Napa Valley Farmworker Foundation.  Community service with these organizations fits squarely into the guidance provided by the U.S. Probation Office on July 18, 2019 with respect to community

service proposals in this case in that: (1) both are community organizations; (2) both focus on "providing opportunities to disadvantaged youth, who often face many obstacles and challenges in life and within the educational system"; (3) both "require significant time, effort, and hands-on work with the population to be served by the placement"; and (4) both are "willing to work with the supervising Probation Officer and provide verification, including the hours and duties performed, via contact with a supervisor …."

   C. <u>Agustin is Completely Rehabilitated and is at No Risk for Recidivism</u>.

  Under 18 U.S.C. § 3553(a), the Court must consider, among other factors, the need for general and specific deterrence.

   *1. Agustin's Conviction and Collateral Consequences to Date Act as a Powerful Deterrent to Criminal Conduct.*

  While the Court must impose a sentence that "afford[s] adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), many courts have recognized that the conviction itself and its collateral consequences can serve as a powerful deterrent to potential criminals. *See, e.g.*, *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (sentencing court properly considered that the "conviction itself already visit[ed] substantial punishment" on defendant by likely barring him from future work in his profession) (internal quotation omitted)); *United States v. Sachakov*, No. 11-CR-120, 2013 WL 101287, at *3 (E.D.N.Y. Jan. 8, 2013) (fact that defendant was likely to lose medical license relevant to setting appropriate sentence). This Court, in sentencing Roger Armstrong to a sentence of home confinement and probation after he pleaded guilty to tax felonies considered that he might lose his CPA as a result of his crimes and factored that into the punishment. *United States v. Armstrong*, Case No. 14-cr-10376-IT, Amended Judgment, Dkt. No. 14, p. 8 ("General deterrence is achieved in this case by a sentence of home detention … and Mr. Armstrong's anticipated loss of his ability to work as a tax preparer in the

future.").  Further, courts have considered a non-incarcerative sentence of probation to be serious punishment.  *Gall*, 552 U.S. 38, at 48–49 ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." (internal quotation omitted)).

As a result of this case, Agustin has suffered severe professional consequences in losing his ability to work in his wine business, something he has done with joy and passion for the past 21 years.  This is a major punishment in and of itself, and is different from many of the parent defendants (such as Sloane and Huffman) whose work does not require licensure.

Layering on top of these consequences a period of two months of imprisonment, no rational person would look at this situation and determine that it would be remotely sensible to engage in any similar conduct.  *See, e.g.*, *United States v. S. Wang*, Case No. 16-cr-10268-IT, Dkt. No. 360, 52:15-22 (indicating that any period of incarceration would send general deterrence message).

### 2.    *The Public Needs No Further Protection from Further Crimes by Agustin.*

The Court must impose a sentence that "protect[s] the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  Agustin's risk of recidivism is nil.  He has no prior criminal history, drug abuse problems or mental health issues.  The letters the Court has received about him demonstrate that this behavior was out of character for him.  Agustin is fortunate to have a strong network of family, friends, and colleagues who have helped, and will continue to help him through this trying period of his life.  Further, Agustin accepted responsibility and entered a plea agreement when the opportunity first presented itself.  All of this supports the conclusion that Agustin is exceedingly unlikely to commit crimes in the future.

D.     <u>Sentencing Analysis</u>.

*1.  Introduction*

Test-taking schemes are often not prosecuted, and are dealt with by the testing agency,

usually by canceling a score and providing an opportunity for a retake.  *See* Valerie Strauss,

Washington Post, *When kids cheat on SAT, ACT* (Mar. 25, 2010), attached as Exhibit B ("The

ACT and the ETS can also decide unilaterally to cancel the test scores []. [T]he schools aren't

told why the scores were cancelled. [] A student can cheat and get caught--but the college or

university that has accepted him or her won't find out from the ETS or the ACT.").  As set forth

below, the rare testing cases that are prosecuted generally result in probationary sentences.

*a.   Other test-taking cases have resulted in probation.*

*i.   Cases in this District.*

One scheme prosecuted in this District involved Chinese nationals arranging for

imposters to take the Test of English as a Foreign Language ("TOEFL") exam in exchange for

payment.  Cheating on the TOEFL exam has significant potential consequences for the U.S.

immigration system.  A passing grade allows the test taker access to substantial benefits, such as

obtaining F-1 non-immigrant student visas for use in attending American universities, and can

also implicate passport misuse, visa fraud and immigration-benefit fraud.  The Department of

Homeland Security has issued an alert regarding TOEFL "scams" due to the serious downstream

visa and passport fraud that can ensue from it.  *See* Dep't of Homeland Sec., *Be Aware of*

*TOEFL Scams* (Apr. 2, 2019), *available at* https://studyinthestates.dhs.gov/2019/04/be-aware-of-

toefl-scams.

The defendants in these Massachusetts TOEFL test-taking cases each pled to a § 371

conspiracy, and all received probationary sentences with the court determining for each

defendant that the total offense level was 10.[5]  *See, e.g.*, *United States v. Yue Wang*, Case No. 17-

cr-10237 (D. Mass. 2017) (Zobel), Affidavit In Support of Criminal Complaint, Dkt. No. 4-1, ¶¶

14-17, Information, Dkt. No. 24, Plea Agreement, Dkt. No. 25, Judgment, Dkt. No. 35, pp. 2–3,

Statement of Reasons, Dkt. No. 36, p. 1 (Wang offered $900 to an impostor take another

person's TOEFL exam and received $7,000 for being an impostor test-taker on three other

TOEFL exams); *United States v. Shikun Zhang*, Case No. 17-cr-10251 (D. Mass. 2017)

(Burroughs), Affidavit In Support of Criminal Complaint, Dkt. No. 4-1, ¶19, Information, Dkt.

No. 23, Plea Agreement, Dkt. No. 24, Judgment, Dkt. No. 37, p. 2, Statement of Reasons, Dkt.

No. 38, p. 1 (Zhang paid $3,000 to an impostor to take the TOEFL exam in her place); *United*

*States v. Leyi Huang*, Case No. 17-cr-10255 (D. Mass. 2017) (Saylor), Affidavit In Support of

Criminal Complaint, Dkt. No. 4-1, ¶18, Indictment, Dkt. No. 15, ¶9, Plea Agreement, Dkt. No.

45, Judgment, Dkt. No. 54, pp. 2-3, Statement of Reasons, Dkt. No. 55 (Huang paid $3,000 to an

imposter to take the TOFEL exam); *United States v. Xiaomeng Cheng*, 17-cr-10225 (D. Mass.

2017) (Casper), Affidavit In Support of Criminal Complaint, Dkt. No. 4-1, ¶¶15–20,

Information, Dkt. No. 20, Plea Agreement, Dkt. No. 21, Judgment, Dkt. No. 33, p. 2, Statement

of Reasons, Dkt. No. 34, p. 1 (Cheng paid an impostor to take the TOEFL exam in her place).

## ii.  *Cases in other jurisdictions.*

Similarly, outside of this District, such test-taking cases have also typically resulted in

sentences of probation instead of incarceration.  For instance, in *United States v. Leuk Kwan*

*Chau*, Case No. 17-cr-00221 (E.D. Pa. 2017), a Chinese national paid for an imposter to take the

TOEFL exam and was charged with mail fraud, passport fraud, and aiding/abetting and entered a

---

[5] In these four cases, defendants agreed to removal.

plea agreement.  Indictment, Dkt. No. 1, ¶¶6–13; Judgment, Dkt. No. 43.  The court sentenced defendant to one-year of probation.  Dkt. No. 43, p. 2.

Another test-taking scheme in the Western District of Pennsylvania is instructive.  In *United States v. Tong, et al.*, Case No. 15-cr-00111 (W.D. Pa. 2015), fifteen Chinese nationals were charged with conspiracy, counterfeiting foreign passports, and mail and wire fraud related to a scheme to defraud the College Board and ETS by having imposters take standardized tests, including the SAT, GRE and TOEFL.  The defendants used fraudulent passports for the purpose of impersonating test takers and ultimately fraudulently obtained admissions to American educational institutions by circumventing the F-1 Student Visa requirements.  Indictment, Dkt. No. 35.[6]

One defendant, Song, acquired a counterfeit passport and hired an impostor to take the SAT for her.  She was accepted at University of California – Irvine, and also received an F-1 visa.  Gov. Sent. Memo., Dkt. No. 203, p. 4.  Song pled guilty to conspiracy to make and use forged passports in violation of 18 U.S.C. § 1543 and wire fraud.  Def. Sent. Memo., Dkt. No. 202, pp. 1–2.  With an offense level of 10 and a Guidelines sentencing range of 6–12 months (Gov. Sent. Memo., Dkt. No. 203, pp. 4–5), the court sentenced her to two years of probation (Hearing on Change of Plea and Sentencing, Dkt. No. 206, p. 1), despite actually taking a "spot" at a college based on the phony test score that then yielded a phony visa.

In 2002, approximately 60 foreign nationals were charged in the District of New Jersey for a scheme in which impostors were paid to take the TOEFL exam for others.  *See United States v. Hedaithy*, 392 F.3d 580, 582 (3d. Cir. 2004).  "The purpose of the scheme was allegedly to create the false appearance that Defendants, among others, had taken and achieved an

---

[6] In this scheme, since defendants were Chinese nationals, several suffered immigration consequences or stipulated to removal.

acceptable score on the TOEFL exam so that they <u>could remain eligible to live in the United States under a student visa</u>." *Id.* (emphasis added).  The majority of defendants involved in this TOEFL scheme were sentenced to probation.  *See, e.g.*, *United States v. Alkaabi*, Case No. 02-cr-00778 (D.N.J. 2002) (sentence of two-years' probation); *United States v. Alsugair*, Case No. 02-cr-00779 (D.N.J. 2002) (same).[7]

Furthermore, the cases cited for prison sentences in the government's Consolidated Sentencing Memorandum (Dkt. No. 423, pp. 10–15) are all inapposite as demonstrated by Defendant Huffman's Reply (Dkt. No. 442), and the Court's questions to the government during Ms. Huffman's sentencing (Dkt. No. 474, 15:12-17:16).  The only potentially relevant case cited by the government was the case of Kelley Williams-Bolar.  *See* Dkt. No. 423, p. 13; *State of Ohio v. Williams-Bolar* (Summit Cnty. Case No. CR-2009-10-3223-A).  Williams-Bolar was charged with one count of grand theft and two counts of tampering with government records. Journal Entry, Dkt. No. 17.  Her crime involved multiple children.  *See* ABC News, *Ohio Mom Kelley Williams-Bolar Jailed for Sending Kids to Better School District, Andrea Canning* (Jan. 26, 2011), *available at* https://abcnews.go.com/US/ohio-mom-jailed-sending-kids-school-district/story?id=12763654.  Ms. Williams-Bolar did not enter a guilty plea and she was convicted after a multiple day jury trial on the tampering with records charges.  Most importantly, the Governor of Ohio commuted her sentence from felonies to misdemeanors because he thought that "the penalty was excessive for the offense."  Sentence Commuted by Governor, Dkt. No. 1; *see* The Columbus Dispatch, *Kasich reduces sentence for Akron mom in school-residency case*, Alan Johnson (Sept. 7, 2011), *available at* https://www.dispatch.com/article/20110907/NEWS/309079828.

---

[7] Many defendants experienced immigration consequences as well.

> b. *The defendants in recent NCAA bribery cases received well below Guidelines sentences.*

The recent college basketball bribery/admissions cases are also instructive. These cases involved a scheme by which families of highly rated men's basketball recruits were offered money in exchange for the student-athletes to pledge to play for certain Adidas-sponsored college basketball programs and to sign with Adidas upon entry into the NBA. *See, e.g., United States v. Gatto, et al.*, Case No. 17-cr-00686 (S.D.N.Y. 2017) *appeals docketed*, Case Nos. 2019cr00783, 2019cr00786, 2019cr00788 (2d Cir. Mar. 28, 2019). This scheme had the effect of steering admissions of student-athletes for corrupt reasons, and making the universities vulnerable to NCAA sanctions for violating NCAA rules requiring college athletes to adhere to a policy of amateurism and to receive no compensation besides scholarship and attendance costs.

The defendants -- Gatto, Code and Dawkins -- worked together to funnel money to parents in order to have student-athletes attend certain schools. Gatto, the former head of Global Sports Marketing at Adidas (Superseding Indictment, Dkt. No. 170, ¶10 (Aug. 14, 2018)), was convicted (Jury Verdict, Dkt. No. 225 (Oct. 24, 2018)) of wire fraud and conspiracy to commit wire fraud and was sentenced to nine-months imprisonment (Amended Judgment, Dkt. No. 328, p. 2 (June 17, 2019)). Probation had calculated Gatto's total offense level as 21 with a Guidelines sentencing range of 37–46 months. Gov. Sent. Memo., Dkt. No. 288, p. 18 (Feb. 26, 2019). Code, a former Adidas consultant, was convicted of wire fraud and conspiracy to commit wire fraud. Dkt. No. 225. Probation had calculated his total offense level at 17 with a Guidelines range of 24–30 months. Gov. Sent. Memo., Dkt. No. 288, p. 18. Code was sentenced to six-months imprisonment. Judgment, Dkt. No. 309, p. 2 (Mar. 15, 2019). Dawkins, an aspiring sports agent, was convicted of wire fraud and conspiracy to commit wire fraud. Dkt. No. 225. Similar to Code, probation calculated Dawkins' Guidelines range to be 24–30 months.

Gov. Sent. Memo., Dkt. No. 288, p. 18.  Dawkins was sentenced to six-months imprisonment.

Judgment, Dkt. No. 308, p. 2 (Mar. 15, 2019).

These sentences demonstrate that, even with a payment of cash bribes to steer admissions

and undermine amateur status of college athletes, courts imposed substantially below Guidelines

sentences (75% off the low end of the Guidelines), even for defendants who went to trial.

> c.  *A Guideline sentence of two-months imprisonment is appropriate to avoid unwanted disparities.*

Under 18 U.S.C. § 3553(a)(6), the court must consider "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of

similar conduct."  Based on other sentences and government recommendations in this case and

related cases, a Guidelines sentence of two months of imprisonment is appropriate to avoid

unwanted disparities.

> i.  *John Vandemoer received a probationary sentence.*

The first sentencing in the so-called "Varsity Blues" investigation was that of John

Vandemoer, the ex-Stanford sailing coach.  He was charged with a racketeering conspiracy

under 18 U.S.C. § 1962, which consisted of multiple acts indictable under 18 U.S.C. §1341 (mail

fraud), §§ 1341 and 1346 (honest services mail fraud), § 1343 (wire fraud), §§ 1343 and 1346

(honest services wire fraud), and § 1956 (monetary laundering).  *United States v. Vandemoer*,

19-cr-10079 (Zobel), Information, Dkt. No. 1, ¶18.  Vandemoer was charged with "designating

applicants as purported recruits for … the Stanford sailing team … in exchange for bribes."  *Id.*,

¶8.a.  Starting in 2017, Vandemoer agreed to designate three of Singer's clients as recruits for the

Stanford sailing team, in exchange for payment of $610,000 (though Vandemoer had only

received $270,000 when the scheme was uncovered).  *Id.*, ¶¶9, 11, 12, 14, 15.

Vandemoer pled guilty to a RICO conspiracy with a total offense level of 20. Vandemoer Plea Agreement, Dkt. No. 3, ¶3. While the government recommended a sentence of 13 months, Judge Zobel sentenced Vandemoer to time served (1 day). Judgment, Dkt. No. 25, p. 2; Statement of Reasons, Dkt. No. 29, pp. 1, 3–4. In the Statement of Reasons, Judge Zobel determined that the sentence was justified, in part, because: "none of the three applicants for admission to Stanford actually went there . . .." Sections VI.D., VIII. Similarly, Agustin's daughter did not go to USC. At the sentencing of Devin Sloane, the Court noted that Vandemoer's probationary sentence was in part likely influenced by the fact that his conduct did not lead to anyone "taking a spot" at Stanford. As discussed above, that is true, though he tried to secure admission for some of Singer's clients.

### ii. Stephen Semprevivo received a sentence of four-months imprisonment.

In connection with payment of a $400,000 bribe, Semprevivo's son took a spot at Georgetown. At sentencing, the government recommended 13-months imprisonment and argued that Semprevivo had not taken responsibility for his crime, emphasizing a suit against Georgetown and his hiring of experts to explain or contextualize his culpability. Further, the Court highlighted at the sentencing that the seriousness of Semprevivo's crime was animated by the fact that his son took a spot from some other deserving applicant whose family did not have $400,000 to spend on an athletic recruitment scheme.

### iii. Devin Sloane received a sentence of four-months imprisonment.

Sloane's sentence is also instructive. Sloane paid $250,000 as part of the scheme to secure admission for his son to USC. Information, Dkt. No. 312, ¶¶169, 178, 181. His conduct also resulted in "taking a spot" from another student. *Id.*, ¶180. The government argued at the sentencing hearing that Sloane was particularly deserving of a long sentence (and recommended

a year and a day) because he had not accepted responsibility, and instead had blamed Singer and USC and hired medical experts to deflect his blame.  It would be just to sentence Agustin, whose conduct did not end up taking a spot from another student, and who has been appropriately contrite and accepting of blame for his crime, to a shorter sentence than Sloane and Semprevivo.

<u>Proposed Sentence</u>

Agustin Francisco Huneeus respectfully submits that a sentence of two-months imprisonment, to be followed by one year of supervised release with a special condition of performing 350 hours of community service and a fine of $95,000 would serve the interests of justice, both for him and for the public.

Dated:  September 27, 2019                     Respectfully submitted,

AGUSTIN FRANCISCO HUNEEUS,

By his attorneys,

/s/ *Jeremy M. Sternberg*
Jeremy M. Sternberg (BBO No. 556566)
John A. Canale (BBO No. 687175)
Holland & Knight LLP
10 St. James Avenue
Boston, MA  02116
(617) 523-2700
jeremy.sternberg@hklaw.com
john.canale@hklaw.com

William P. Keane (admitted *pro hac vice*)
Aviva J. Gilbert
Farella Braun + Martel LLP
235 Montgomery St.
San Francisco, CA  94104
(415) 954-4908
wkeane@fbm.com

CERTIFICATE OF SERVICE

I, John A. Canale, hereby certify that this document was filed on September 27, 2019, via the ECF system, and was sent electronically on that date to the parties' counsel of record and to United States Probation Officer Martha Victoria by e-mail.

/s/ *John A. Canale*
John A. Canale