SEALED SIDEBAR REMOVED

1                     UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
2

3

4                                          )
     UNITED STATES OF AMERICA,             )
5                                          )
             Plaintiff,                    )
6                                          )   Criminal Action
     v.                                    )   No. 1:19-cr-10117-IT-7
7                                          )
     AGUSTIN FRANCISCO HUNEEUS,            )
8                                          )
             Defendant.                    )
9                                          )

10

11               BEFORE THE HONORABLE INDIRA TALWANI
                    UNITED STATES DISTRICT JUDGE
12

13

14                           SENTENCING
                   **SEALED SIDEBAR REMOVED**

15

16                        October 4, 2019
                            2:30 p.m.

17

18          John J. Moakley United States Courthouse
                       Courtroom No. 9
19                    One Courthouse Way
                   Boston, Massachusetts 02210
20

21

22             Linda Walsh, RPR, CRR
                  Official Court Reporter
23        John J. Moakley United States Courthouse
             One Courthouse Way, Room 5205
24             Boston, Massachusetts 02210
                   lwalshsteno@gmail.com
25

SEALED SIDEBAR REMOVED

1    APPEARANCES:

2    On Behalf of the Government:

3          UNITED STATES ATTORNEY'S OFFICE
           By: AUSA Justin D. O'Connell
4              AUSA Kristen A. Kearney
           One Courthouse Way
5          Boston, Massachusetts 02210
           617-748-3100
6          justin.o'connell@usdoj.gov
           617-748-3204
7          kristen.kearney@usdoj.gov

8
     On Behalf of the Defendant:
9
           HOLLAND & KNIGHT
10         By: Jeremy M. Sternberg, Esq.
               John A. Canale, Esq.
11         10 St. James Avenue, 11th Floor
           Boston, Massachusetts 02116
12         617-854-1476
           jeremy.sternberg@hklaw.com
13         617-619-9228
           john.canale@hklaw.com

14

15

16

17                  Proceedings reported and produced
                      by computer-aided stenography
18

19

20

21

22

23

24

25

─────────SEALED SIDEBAR REMOVED─────────

1           P R O C E E D I N G S

2           THE CLERK:  The United States District Court is now in

3    session, the Honorable Judge Indira Talwani presiding.  This is

4    Case Number 19-CR-10117, *United States versus Agustin Francisco*

5    *Huneeus*.

6           Would counsel please identify themselves for the

7    record.

8           MR. O'CONNELL:  Good afternoon, Your Honor.

9           Justin O'Connell for the Government with Kristen

10   Kearney.

11          MS. KEARNEY:  Good afternoon.

12          THE COURT:  Good afternoon.

13          MR. STERNBERG:  Good afternoon, Your Honor.

14          Jeremy Sternberg and John Canale on behalf of Agustin

15   Francisco Huneeus.

16          THE COURT:  Good afternoon.

17          We are here for sentencing, and I have received and

18   gone through a number of documents here.  The presentence

19   report prepared August 30th and revised September 27th.

20   There's no Probation Office sentencing recommendation per the

21   Government's objection.

22          The Government's memorandum regarding methodology for

23   calculating gain or loss under the guidelines, and Probation's

24   submission and response to the Court's order, and those were

25   all addressed in my memorandum and order at 443 on the docket.

SEALED SIDEBAR REMOVED

1        I have the Government's sentencing memorandum as to

2   all defendants, Docket 423, filed September 6th.

3        A sentencing memorandum as to Mr. Huneeus filed

4   September 27th, and then sealed exhibits filed per Government's

5   motion that was allowed on October 2nd.

6        And then I have the defendant's sentencing memorandum

7   and Exhibits A, which are A sub 1 through 40, and B filed

8   September 27th, and then I have victim impact statements from

9   College Board dated August 7, ETS dated August 9th, and USC

10  dated August 7th.

11       Is there any other material that's been submitted by

12  the parties to the Court?

13       MR. O'CONNELL:  Nothing from the Government, Your

14  Honor.

15       MR. STERNBERG:  No, Your Honor.

16       THE COURT:  And to Probation, was any information

17  withheld from the presentence report pursuant to Rule 32(d)(3)?

18       U.S. PROBATION:  No, Your Honor.

19       THE COURT:  Thank you.

20       Counsel, do you have any witnesses or victims present?

21       MR. O'CONNELL:  Not for the Government.

22       THE COURT:  Okay.  And, defense counsel, have you had

23  an opportunity to review all the materials submitted in

24  connection with the sentencing?

25       MR. STERNBERG:  We have, Your Honor, and we've had an

SEALED SIDEBAR REMOVED

1   opportunity to go over them with Mr. Huneeus.

2          THE COURT:  Thank you.  And, Mr. Huneeus, have you

3   reviewed all the material that's been submitted in connection

4   with sentencing?

5          THE DEFENDANT:  I have.

6          THE COURT:  And have you had an opportunity to discuss

7   it with your counsel?

8          THE DEFENDANT:  Yes, ma'am.

9          THE COURT:  And to defense counsel, were you expecting

10  any evidentiary hearing or witnesses?

11         MR. STERNBERG:  We are not.

12         THE COURT:  Okay.  So that means I'm turning next to

13  the objections to the contents of the Probation -- of the PSR.

14  There are 11 objections by the Government, and I believe

15  Objections 1 to 10 were resolved under my earlier memorandum.

16  I understand the Government continues to object, but there's

17  nothing further I need to do on those, correct?

18         MR. O'CONNELL:  That's right, Your Honor.  Just

19  preserve our objection.

20         THE COURT:  That's fine.  And then Government

21  Objection 11 I think concerned restitution.  But at this point,

22  am I correct that there's no further request for restitution?

23         MR. O'CONNELL:  That's right, Your Honor.

24         THE COURT:  Okay.  And then with regard to the

25  defendant's objections, I've read all of the objections and all

SEALED SIDEBAR REMOVED

1    of the responses from the Probation Office, and I understand

2    some of these things may be matters that you will argue in

3    connection with the -- with your argument on sentencing, but

4    are there any matters that you contend I should be correcting

5    in the PSR?

6              MR. STERNBERG:  No, Your Honor.  We're satisfied with

7    Probation's treatment of all of the objections.

8              THE COURT:  Okay.  Thank you.

9              MR. STERNBERG:  There is one matter with respect to

10   the PSR that has to do with Mr. Huneeus's daughter that we ask

11   to be heard at sidebar on.

12             THE COURT:  Certainly.

13             (At sidebar.)

14                          * * * * *

15                     (SEALED SIDEBAR REMOVED)

16                          * * * * *

17             (End of sidebar.)

18             THE COURT:  I think with that we are -- move on to the

19   offense level computation.  The statute at issue, 18 U.S.C.

20   Section 1349 under the guidelines, the base offense level here,

21   based on the underlying conduct, was a level 7.  I've rejected

22   the Government's argument regarding using the amounts paid to

23   change that level, and based on that, I am at an offense level

24   of 7 for the offense and then after a two-level decrease for

25   acceptance of responsibility, a total offense level of 5.

SEALED SIDEBAR REMOVED

1        I understand the Government objects to my not

2   including the financial amount, but other than that objection,

3   is there any, which is not -- which is -- the Government's

4   objection which is preserved, is there any further objection?

5        MR. O'CONNELL:  No further objection from the

6   Government.

7        MR. STERNBERG:  No, Your Honor.

8        THE COURT:  So we're proceeding with a total offense

9   level of 5.  There are zero criminal history points here, which

10  gets us to a criminal history category of I.  So the sentencing

11  options I have here, the statutory provision, custody not more

12  than 20 years; the guideline provision, zero to six months.

13  Supervised release, statutory, not more than three years;

14  guidelines, one to three years.  Probation, statutory

15  provision, one year to five years; guideline, not more than

16  three years.  Statutory -- fines, statutory provision, not more

17  than $250,000; guideline provision, $500 to $9,500.

18  Restitution is not at issue.  Special assessment of $100.

19        So with that, I will hear from the Government as to

20  its recommendation.

21        MR. O'CONNELL:  Yes, Your Honor.  May I take the

22  podium?

23        THE COURT:  Absolutely.

24        MR. O'CONNELL:  Thank you.

25        Good afternoon, Your Honor.  For this defendant,

SEALED SIDEBAR REMOVED

1    Agustin Huneeus, a sentence of 15 months of imprisonment is

2    sufficient but not greater than necessary to achieve the

3    purposes of 3553(a).  Three of the aggravating factors set

4    forth in prior sentencings of his co-conspirators show this

5    result is warranted.

6            First, he was a repeat player.  Huneeus is the only

7    parent before Your Honor to have engaged in both the exam

8    cheating and the side door schemes.

9            Second, he was one of, if not the most active of the

10   defendants in this information.  He knew what he wanted.  That

11   was a fraudulent advantage for his daughter.  He knew how to

12   get it, and he pushed for that result.

13           THE COURT:  Well, when you say he was the most active,

14   he had conversations urging Mr. Singer to make things happen,

15   but in the other sentencings, the Government has pointed to

16   actions as -- actions independent of Mr. Singer.  So for you to

17   say that he's the most active seems different than the way you

18   were considering that idea with the other defendants.

19           MR. O'CONNELL:  I respectfully disagree with that,

20   Your Honor.  I think that while all of these conversations and

21   the active behaviors that were taken by other defendants, like

22   Mr. Sloane putting his son in the water pool in his kids'

23   yard -- in the backyard, that was all at the direction and

24   consultation of Rick Singer.

25           So in this instance it wasn't just conversations that

SEALED SIDEBAR REMOVED

1   Mr. Huneeus was having.  He went forth and actually on recorded

2   telephone calls said that he was going to and had implemented

3   the scheme.  He asked his daughter to write a fake e-mail to

4   USC that would say that she was going to be an athlete when she

5   joined and a capable one at that.  That e-mail did happen.

6           THE COURT:  But that was the same scheme that

7   was -- that Mr. Singer was pushing and suggesting.  I mean, he

8   didn't come up with this idea on his own.

9           MR. O'CONNELL:  No.  The defendant did come with one

10  very unique idea on his own.  He called it his original idea,

11  and that was to have his older daughter, a college student,

12  take the ACT exam on behalf of his younger daughter.

13          THE COURT:  Thought about and rejected it.

14          MR. O'CONNELL:  He thought about it, and yes, Your

15  Honor, it didn't go forward, but he offered it because he

16  wanted to get more fraudulent scores.  He already had obtained

17  the SAT fraudulent score at that point in time.  He wanted

18  additional avenues to increase her likelihood of success in the

19  application process down the road even more.  He explored both

20  that original idea -- he called it, in his own words, his

21  original idea.  So it's not true that this defendant didn't

22  come up with his own ideas.

23          While you're right, Your Honor, it was all moving

24  forward to try and get the scheme accomplished, which was the

25  guaranteed spot at USC, he did have his own ideas, and he

SEALED SIDEBAR REMOVED

1   implemented through a two-year period of time those ideas.

2   Lying to high school counselors to get the tests moved to the

3   site at Singer's corrupt facility.  And then at the end of the

4   scheme even agreed with Mr. Singer to lie to the IRS.  We'll go

5   through some of those details in this brief, but I don't think

6   it's accurate to say he didn't have his own ideas or that he

7   wasn't actively doing things, he was just sitting there

8   listening to telephone conversations.

9        The third point, Your Honor, and probably the most

10  troubling, is that Huneeus repeatedly used his daughter in the

11  scheme.  He did this for the course of two years, and we'll

12  talk a little bit about how that happened in a bit.  But before

13  we get to these points, Your Honor, I would like to address a

14  misconception in the defendant's memorandum.  His brief claims

15  that the defendant's crime did not harm anyone.  Due to his

16  arrest in March of 2019, his daughter did not take a spot from

17  another deserving individual is what his memorandum says.  That

18  is wrong.  Wrong because as Huneeus was told at the time he was

19  committing the offense, his daughter was admitted to USC as a

20  student athlete in November of 2018.  At that very moment,

21  months before his arrest, she took a spot that was dedicated

22  for real athletes.  At USC, as Your Honor is aware, athletic

23  recruiting -- athletic recruits seeking admission appear before

24  a single admissions subcommittee.

25       Donna Heinel, one of the USC employees that the

SEALED SIDEBAR REMOVED

1   defendant agreed to bribe, acted as the liaison from athletics

2   to that committee.  She presented applicants, most real

3   recruits, but if someone like the defendant was willing to pay

4   a bribe, she would also include fake ones, too.  That unwitting

5   admissions committee voted on whether to admit students to USC.

6   Athletics doesn't have an unlimited number of admission spots.

7   In the academic year the defendant's daughter was admitted,

8   that committee rejected several recruits, including those

9   seeking admission in the sport exploited here, water polo.  In

10  fact, in one instance, Donna Heinel decided not to put forth a

11  water polo recruit to that committee.  By giving an admissions

12  spot to the defendant's daughter, who was not a real recruit,

13  she, by definition, replaced another student.

14          Admissions, even in athletics, is a zero-sum game.

15  Real kids got hurt, USC was victimized, and that happened well

16  before the date of his arrest.

17          Turning back to the aggravating factors, Your Honor.

18          THE COURT:  I just want to stop you on that one.  It

19  seems that the point that you're fighting over, and I can

20  anticipate the response from defense counsel, is to whether

21  there was actually that spot and that spot taken and was it a

22  conditional acceptance.  It seems a little bit beside the

23  point.  I mean, isn't what I'm sentencing here for the

24  conspiracy to commit this offense, and isn't the question I

25  should be asking whether he intended to get that spot, whether

1   it was completed, whether it was -- I mean, the argument about

2   yes, it was actually filled in November or it was actually

3   filled in April really seems beside the point.

4        MR. O'CONNELL:  I don't disagree with you on that

5   point, Your Honor.  The conspiracy happened when he intended

6   and entered into that conspiracy and committed the overt acts

7   which happened, you know, even before the time period I'm

8   talking about.

9        But I am also just making the point that even though

10  it is a conspiracy, there was real harm here and actual

11  victims, which I think is a point that the defense -- and I'll

12  allow them to make their own points up here, but they were

13  trying to suggest otherwise, that someone didn't get harmed by

14  his acts.

15       But to turn back to the aggravating factors, Huneeus

16  was a repeat player.  For two years he continually sought out

17  Singer's illicit services.  At the time he recognized on

18  multiple occasions that his conduct was wrongful.  He said that

19  it was cheating, he said it made him feel guilty, but he never

20  hesitated.  Despite that, those feelings, he never slowed down.

21  He continued to press for more.  His involvement began with the

22  cheating scheme on his daughter's SAT exam.  This was the exam

23  that Riddell took for his daughter in which he scored 1380.

24       THE COURT:  So I have no facts in front of me to

25  support that assertion that the exam was taken for the

─────────────SEALED SIDEBAR REMOVED─────────────

1    daughter.

2              MR. O'CONNELL:  I think --

3              THE COURT:  I think the facts I have in front of me is

4    that Riddell corrected the daughter's exam.

5              MR. O'CONNELL:  Fair enough, Your Honor.

6              THE COURT:  Thank you.

7              MR. O'CONNELL:  I would agree with that, that Riddell

8    corrected the exam and got a score for his daughter of 1380.

9    That score is in the 96th percentile nationally.  For Huneeus,

10   that was not enough.  He paid his $50,000, but he also demanded

11   an explanation as to why Bill McGlashan, a co-conspirator, who

12   has been charged with participating in the same scheme, got a

13   better result for his kid.  Huneeus asked why his daughter's

14   score hadn't been 1500, the equivalent of what McGlashan's son

15   got.  Singer told Huneeus that would have gotten them in

16   trouble because they would have gotten caught.  So what did

17   Huneeus do?  He asked how they could cheat again on different

18   tests.  He wanted to know how to get a fake score -- if a fake

19   score on the ACT would improve his daughter's chances further.

20   And he asked about the same for the SAT subject tests.  He was

21   told each additional test would cost another $50,000, but he

22   ultimately did not go through with them because Singer

23   convinced him that the artificially inflated score that she

24   already had was sufficient to get in through the side door at

25   USC.

─────SEALED SIDEBAR REMOVED─────

1     He then explored the side door at USC that guaranteed

2  admission, and asked in a lot of detail as to how that process

3  would work.  What he was told was that it would cost him

4  another $250,000 in bribes.  The first $50,000 would go to

5  Donna Heinel to secure his daughter's admission as a recruited

6  athlete.  The second $200,000 would be funneled through

7  Singer's fake charity to the water polo coach, Jovan Vavic, for

8  giving up spots on the roster.

9     Singer would also need to create a fake profile so

10  Huneeus's daughter could be represented to that subcommittee

11  that we discussed.  For Huneeus bribing two USC employees would

12  be no problem.  A fake profile was also not an issue.  His

13  concern at that time was that Singer guarantee that his money

14  would be repaid to him or not due if the scheme didn't work.

15     He was also one of the more active participants.

16  Lying during the conspiracy came naturally to Mr. Huneeus.  The

17  lies started with his daughter's high school, and they

18  continued to that IRS call that we discussed a little earlier

19  when Mr. Singer proposed lying to the IRS, and the defendant

20  responded, "Dude, what do you think, I'm a moron?"  This

21  defendant's only natural first response was to lie to the IRS.

22  For him there was no other option.

23     When the scheme wasn't performing as he desired, he

24  demanded more, requiring an additional level of comfort that he

25  was getting the support that more connected and even wealthier

SEALED SIDEBAR REMOVED

1   co-conspirators were getting.  Huneeus's concern was that the

2   fraud work seamlessly.  We talked about this point, but I'll

3   just say it again briefly.  He came up with his own ideas,

4   including the use of his second daughter for taking the test

5   for his younger daughter.  That idea was representative of an

6   extremely troubling aspect of the defendant's commission of the

7   crime.  And that is the use of his children.

8        He showed no concerns whatsoever about notifying his

9   daughters that the crime -- his daughter that the crime was

10  occurring.  But also directing her on several occasions to

11  advance that scheme.  This wasn't a one-off e-mail.  This

12  wasn't just one photo shoot.  He used his daughters in multiple

13  acts over multiple years.  He did so in the testing.  The

14  defendant in his brief claims that Singer was the one who

15  informed her of that testing.  That's beside the point.

16  Huneeus chose to proceed with the testing scheme knowing that

17  his daughter knew about it.  Furthermore, the defendant didn't

18  dispute that he involved his daughter in the side door scheme.

19  And that's because he couldn't.  He asked his daughter to write

20  that fake e-mail to USC to be used for the subcommittee

21  process.  He also asked for months, six months for a water polo

22  picture to be included in her fake profile.

23        But he also allowed Singer to explain the side door,

24  and how do we know this?  We have it on tape.  The defendant,

25  his daughter and Singer met in person, and his daughter asked,

1    "When will I know about USC, assuming we do this water polo

2    thing?"  Singer turned to Huneeus for guidance as to how to

3    respond and whether to respond, and the defendant said he

4    could.  After providing that update as to what was going on

5    with the state of affairs of the side door and that she would

6    likely be admitted in November, the defendant, not Singer, the

7    defendant jumped in and said "But we're not going to say this

8    to anyone."  He was the one who ordered his daughter to conceal

9    the fraud.  He told her to have a, quote, "keep-your-trap-shut

10   mentality."  For Huneeus, it wasn't just about participating in

11   the fraud.  It was about doing everything possible to maximize

12   the fraud and the benefits to himself.

13        In several of the sentencings in this matter, there

14   have been discussions about a moral line.  Did the defendant

15   when no one else was looking have a threshold that he or she

16   would not cross.  Huneeus during this crime displayed no such

17   line.  This is one of the reasons, amongst the others discussed

18   in our brief and earlier today, that this defendant deserves

19   the longest sentence of anyone of the 11 people charged in this

20   information.

21        THE COURT:  So I know the Government made

22   recommendations different than the ones I have imposed.  And I

23   can fit in as viewing your assertion that this defendant is

24   more culpable than some of the other defendants I've sentenced,

25   but given the sentences that I've imposed, are you contending

1  that what he did is deemed four times more than his

2  co-defendants versus slightly more than his co-defendants,

3  recognizing that you disagree with my starting point?

4          MR. O'CONNELL:  Yeah, it's a hard question to answer

5  because of that last point, Your Honor.  We do disagree with

6  your starting point.  But, yeah, that is the recommendation as

7  we've set forth in our brief, and we stand behind it, that a

8  15-month sentence would be appropriate here.

9          THE COURT:  But you did not make an initial

10  recommendation four times the next most culpable in your view

11  or three times the most culpable?

12          MR. O'CONNELL:  No, but in fairness, we didn't know

13  what Your Honor was sentencing.

14          THE COURT:  I understand that you don't agree with

15  where I have been sentencing the defendants, but --

16          MR. O'CONNELL:  Right.

17          THE COURT:  -- from my point of view, it seems to me,

18  you would understand that from my point of view I'm intending

19  to be internally consistent here.  So given my logic of

20  proceeding in an internally consistent manner, explain to

21  me -- is the Government's view this is slightly worse than what

22  happened or is it your view this is so much worse, and if so

23  much worse, then why were the numbers close together before?

24          MR. O'CONNELL:  I wouldn't -- if I could, Your Honor,

25  answer that in two parts.

SEALED SIDEBAR REMOVED

1        The first part is, is this conduct greatly worse or

2   somewhat worse?  I think it is greatly worse.  I mean, he

3   committed two different acts.  Your Honor has nobody else

4   before her who did that.  He didn't stop at the first one.  He

5   didn't have any reservations.  If, you know, look at our

6   briefing and the exhibits that we filed with you, you can hear

7   that he had no reservations whatsoever throughout the process.

8        Is it a different -- completely different conspiracy

9   that is not like the others?  Obviously that's not the case.

10  We charged him in the same conspiracy.  But his conduct during

11  that conspiracy is unlike any other conduct that Your Honor has

12  before her.  He did this multiple times, explored doing it even

13  more times, and it wasn't like some of the other defendants

14  have expressed to you, a concern about not continuing on like

15  Ms. Huffman did.  This defendant abandoned it to do the next

16  scheme.  He wanted to go forward and said the USC side door is

17  good, and I have a good enough score.  He was talked into that.

18  Notably all those conversations were before Mr. Singer was

19  working with the Government.  This wasn't -- this was naturally

20  occurring conversations that they had at that time that we

21  heard on the wire.  It was not influenced at all by anybody

22  other than the defendant's choices.

23        He is different.  He involved his kids.  He -- and I

24  grant you, Your Honor, that he didn't bring his second daughter

25  in, but he did ask to bring her in.

—————————————SEALED SIDEBAR REMOVED—————————————

1          THE COURT:  Okay.  But be careful.  You're speaking to
2     the public as well as to me so you're making accusations
3     involving his kids.  He did not involve more than one kid here.
4          MR. O'CONNELL:  Your Honor, I'm using what he said.  I
5     am not saying that he involved both kids.  I think that is
6     right, and I don't want to have anybody have a different
7     impression.  The only important thing for Your Honor to
8     consider is what this defendant was doing.  He didn't actually
9     use her, but he offered to use her because they looked alike.
10    That's his own words.  That's not me involving his kid.  That's
11    him involving his kid.
12         THE COURT:  I'm just cautioning you to use language
13    with care.
14         MR. O'CONNELL:  Understood, Your Honor.
15         So to return, do we think this defendant is more
16    culpable?  The answer is yes.  Do we think the Government
17    thinks that the 15-month recommendation satisfies the 3553(a)
18    factors?  We think that is appropriate.  And I think it is
19    appropriate even within the context of what Your Honor's prior
20    sentences have been because of the fact that, as Probation has
21    articulated to you, that going above the guidelines range is
22    appropriate in these instances because certain factors, like
23    the way Your Honor decided the loss/gain issue, in your
24    interpretation of that issue, that's not the loss and gain and
25    the amount paid is not a factor for increasing the sentence.

1     But because of that, in that interpretation, that means that's

2     a factor that could be used to exceed the guidelines.  And

3     here, that's another point against Mr. Huneeus.

4          Out of all of the people before you, he agreed to pay

5     the second most.  I get that's not going to increase his

6     guideline sentence, but that is a factor and that's a reason

7     why you should be going above for this defendant.

8          Thank you, Your Honor.

9          THE COURT:  Thank you.

10         Counsel?

11         MR. STERNBERG:  Thank you, Your Honor.  May I argue

12    from counsel table?

13         THE COURT:  Absolutely.

14         MR. STERNBERG:  The Government tries to reduce the

15    essence of Agustin Huneeus to this crime and to a carefully

16    edited series of sound bites extracted from taped conversations

17    with Rick Singer.  That's not the man that Mr. Huneeus was

18    before he met Rick Singer, and it's not the man he is today.

19         To be sure, Mr. Huneeus committed this crime, though

20    he did not seek out Rick Singer to engage any fraud scheme.  In

21    fact, it's important to note that the beginning of the

22    relationship with Rick Singer was for completely legitimate

23    college counseling, essay editing, college list preparation,

24    SAT tutoring.  Over time absolutely the relationship crossed

25    the line from legitimate to fraudulent, but that's actually one

1    distinguishing feature.  Some of the defendants in front of

2    Your Honor, including one yesterday, started a relationship

3    with Rick Singer for fraudulent reasons.  This one did not.

4         After being charged, Mr. Huneeus immediately took

5    responsibility, signed a plea agreement, pled guilty in this

6    courtroom, and has been doing his level best at home, in his

7    community, and in what's left of his professional life to move

8    forward, to find a path forward.

9         Now, the Government's briefs and arguments make no

10   real effort to address the guideline issues, the 3553(a)

11   factors, Mr. Huneeus's life, his post-plea conduct.  Instead

12   they focused almost exclusively on this carefully curated

13   series of sound bites from these recorded conversations.  Now,

14   despite asking for access to the full tapes in writing months

15   ago, I only received them, as a result of Your Honor's

16   discussion yesterday with Mr. Rosen in the courtroom, late last

17   night.  And even in the hours that I've had reviewing the full

18   tapes in context, they are much more nuanced, much more -- much

19   less dark than the Government portrays them.  In fact, they

20   revealed Mr. Huneeus wrestling over time with whether to go

21   forward with this admission scheme.  He asked repeatedly

22   Mr. Singer "What happens if we don't do this?  Where would my

23   daughter -- what schools would be eligible for her?"

24        And this business about involving his other daughter

25   for subject matter tests or ACT, none of that happened.  Those

SEALED SIDEBAR REMOVED

1  are musings on a long phone call that was recorded with

2  Mr. Singer, and to the extent that other defendants have gotten

3  so-called credit for not involving another kid, not deciding to

4  do the side door, he didn't do any of those things.  Those were

5  part of a discussion.  They never happened.  They have taken a

6  surprisingly inordinate amount of time of the Government's

7  argument to talk about things that never happened.

8        So to be sure, even though he wrestled with some of

9  these issues on tape, yes, he ultimately failed and made a

10  horrible decision and went forward with the crime with

11  Mr. Singer, and he's pled guilty for it and is now here to be

12  sentenced for it.  But the narrative is not nearly as dark when

13  one looks at all the tapes and sees all the tapes in total.

14        Now, the Government has urged the Court to view this

15  crime through the lens of a matrix that they've created.

16  Various factors where they score the same -- defendants who

17  have pled guilty to the same crimes.  How much did they pay,

18  were they repeat players, did they involve their children, how

19  active were they, and other factors that they can glean from

20  these recordings.

21        I've explained in our brief that Mr. Huneeus actually

22  fares better than many parents if you use that kind of matrix,

23  but the matrix approach isn't appropriate for his case for a

24  few reasons.  First, the matrix approach that the Government

25  seeks the Court to adopt or urges on the Court has a heads I

─────SEALED SIDEBAR REMOVED─────

1    win, tails you lose component to it.  And let's take the

2    involvement of the children as an example of that.  The

3    Government urges that for some parents they should get a

4    harsher sentence because they used deception to keep the scheme

5    from their child.  As to Mr. Huneeus and other parents, they

6    urge a harsher sentence because he involved his child.

7         THE COURT:  So I would agree with you that arguing

8    every case to its maximum makes it sometimes hard for the

9    Government to keep their idea of the matrix that they are using

10   very reliable, but I don't disagree with the Government that it

11   is of some moment for me to try -- I have 11 defendants in

12   front of me.  I have an obligation to try and not sentence

13   defendants differently for the same offense, and so I do have

14   to pull apart in some measure what the -- how the conduct

15   stacks up one to another.  So put aside their characteristics

16   of it -- I agree with you, that they do have a heads we win,

17   tails you lose aspect at times.

18        But putting aside the argumentative piece of it, just

19   trying to break down what I have here, your client is the only

20   defendant I have who engaged in both of the schemes.  And the

21   question about the involvement of the children plays out for me

22   I think a little bit as follows, which is that to the extent

23   that the child is aware of the illegality of the wrongful

24   act -- there's a couple of different possibilities.  Either the

25   child doesn't understand this is wrongful, and that's kind of a

SEALED SIDEBAR REMOVED

1  hard thing to understand when it's cheating on tests.  The side

2  door thing may have been more complicated depending on how that

3  was presented, but certainly -- and false statements in an

4  application or any cheating on a test, I think that's being

5  conveyed to the child, but frankly, it's also putting the

6  children in harm's way.

7      I mean, one of the issues here has been sort of what

8  happens when you have parents bringing their children in there,

9  and it would certainly be my hope that the Government would

10  understand that there is no value in trying to have the

11  children suffer more than they probably have through all of

12  this.  I find some of the rhetoric about that troubling because

13  of how difficult it may make for these children going forward,

14  but the defendant ultimately is the one who put the children in

15  harm's way and so that is a piece of this.

16      I take your point that they're arguing it from both

17  sides, but from my point of view, it does make some difference

18  that the defendant in the pursuit of what was ostensibly for

19  their children's interest put their child in a position where

20  they could worry that the Government is going to be prosecuting

21  them for a felony.

22      MR. STERNBERG:  Your Honor, let me address that

23  concern.  It's obviously an important point.

24      First of all, Your Honor knows from the presentence

25  report about Mr. Huneeus's daughter, steps she has taken to

1    start over.

2         THE COURT:  And let me say in this regard, from

3    everything I can see from the presentence report, this is a

4    young woman who did not need Mr. Singer's devices.  And I hope

5    she's able to pick up from all of this and move forward, and I

6    hope that the statements about all of these efforts that the

7    Government is suggesting that her father did don't come back to

8    harm her where, from what can be seen here, she, left to her

9    own devices without Mr. Singer's, quote, assistance, would have

10   fared well for herself and hopefully will fare well for

11   herself.  So I think that is pretty plain here.  That doesn't

12   help his actions here, and my sentencing here of what he's done

13   here.

14        MR. STERNBERG:  Right.  I was referring to her new

15   and, I hope, continued good path as a background for this

16   situation where Mr. Huneeus enters a relationship with

17   Mr. Singer for good reasons, good purposes, legitimate

18   purposes, necessarily then involved his daughter at that point.

19   So she is talking about colleges with him, she's having essays

20   edited by him, she's using his legitimate SAT tutors.  So she

21   knows him.  She has a relationship with him.  He calls her on

22   her cell phone.  As the relationship unfortunately crossed the

23   line, she was already involved with him.  There's no defense to

24   the crime.  Mr. Huneeus has obviously pled guilty to it.  But

25   his daughter had a relationship with Mr. Singer and so covering

─SEALED SIDEBAR REMOVED─

1   up from her what was already going on was much more

2   complicated.

3         THE COURT:  No, but perhaps -- perhaps stopping it.

4   At the moment when Mr. Singer is spilling the beans to engage

5   the daughter now in this -- I mean, remember, this is man who's

6   ultimately wearing a wire, who's ultimately cooperating.  A

7   parent engaging in a wrongful action with a criminal doesn't

8   want to be putting his child there.

9         MR. STERNBERG:  There's no argument against that, that

10  putting his child in harm's way is one of the worst things

11  about this whole case for him.  And there's nothing defensible

12  that can be said about it, understanding that the relationship

13  started in a normal positive way.  It transformed itself into

14  an unfortunately criminal way.  Singer is the one who disclosed

15  that to her originally and, yes, of course, lines were crossed.

16  Should it have been stopped?  No question about it.  But it

17  wasn't as simple as a parent decides to disclose something to a

18  child.  Something had been disclosed to a child by Singer.

19  Should he have stopped it?  Absolutely.  But at that point they

20  were down the path on something that unfortunately they

21  continued on.

22        And with respect to Your Honor's question about both

23  schemes, yes, in front of you Mr. Huneeus is the only parent

24  charged in both schemes.  There are a number of others in Judge

25  Gorton's session, as I think the Court knows.  As we talked

SEALED SIDEBAR REMOVED

1   about in the brief, yes, there are two different components to

2   it, but as the tapes with Singer make more clear, over time it

3   became part of a single effort to get a single admission slot.

4         There are two pieces to it, of course, but what was

5   driving the scheme here was to get a single admission slot at

6   USC, and that gets to the other point about why the

7   Government's matrix really doesn't work in this case.  We

8   obviously disagree with the Government.  The conditional

9   acceptance that his daughter got in November of 2018 was just

10   that, it was conditional.  It was not a final.  Final

11   admissions decisions are made in March or April.  She did not

12   get one of those spots and never will.

13         THE COURT:  Yeah, but that's only because the scheme

14   blew up.

15         MR. STERNBERG:  Well, exactly.  There's an external

16   circumstance that came up, but that's actually not very much

17   different from the Stanford sailing coach who was sentenced by

18   Judge Zobel, John Vandemoer.  He made efforts to actually

19   secure two or three slots for students at Stanford, and because

20   of also external circumstances, the student decided to go

21   somewhere else, the student decided to apply early somewhere

22   else, things out of his control, Judge Zobel found that his

23   sentence should be a day in prison because none of those

24   students actually went to Stanford.

25         THE COURT:  Well, and there was no evidence that the

1   coach actually pocketed any money in that case.

2          MR. STERNBERG:  Right, that's a distinguishing

3   feature.

4          THE COURT:  Well, but it's not just the one point.  I

5   don't think anything I've done here is inconsistent with what

6   Judge Zobel has done there.  I think the question that no one

7   got a spot is a little bit more a cogent question when you're

8   talking about what steps the coaches did and what they were

9   buying and selling, and in that case it was neither money

10  personally in the hands of the coach nor a spot personally

11  taken away from someone else.  So it's a bit of a different

12  piece here.

13         I think here, when we're looking at what the parents

14  were doing, not what the coaches were doing, when we're looking

15  at what the parents were doing, you know, it is never -- I

16  mean, I have used the term you've got a spot that could have

17  gone to someone else, but I think we all know that there's, you

18  know, a certain number of spots that get offered and then some

19  students accept and some don't and you've got your yield and

20  your percentage, but the point is that you have taken the

21  opportunity for -- you have made the effort to take the

22  opportunity to get that offer letter.  So here it was a

23  conditional offer who didn't get the final.  But from the point

24  of view of what this defendant did and what I'm sort of looking

25  at the nature of his crime, I guess I don't see it as very

1     different from had the spot been offered.  I mean, frankly, it

2     probably has helped his daughter, that she was able to go and

3     apply somewhere else and get in on her own somewhere else and

4     be able to move on and is in a better position because of it.

5     But I'm not sure it makes his crime any different as to what he

6     was trying to accomplish.

7            MR. STERNBERG:  Not in terms of what he was trying to

8     accomplish.  He was trying to accomplish the same thing as

9     Devin Sloane or Stephen Semprevivo or some of the other

10    defendants in front of Your Honor and in other courtrooms, but

11    there is a difference in terms of what he accomplished or

12    didn't accomplish.  And yes, it was an external circumstance,

13    but it's a -- it was also an external circumstance that

14    prevented the Stanford -- Stanford from admitting two or three

15    students as a result of what Mr. Vandemoer did.

16           And when USC sent out its, whatever it was, 3,000

17    admit letters in April of this year, his daughter wasn't among

18    them.  There was a student among those who got one of those

19    letters and his daughter didn't.  And is it the result of

20    timing and serendipity, yes, but the central feature of this

21    case from the Government's perspective, as they've said in

22    their briefs, as they said at the news conference the day the

23    case was announced, this is a zero-sum game, and the core ill

24    at the core of this case is taking a slot from someone else,

25    and that didn't happen here.  His daughter never enrolled,

SEALED SIDEBAR REMOVED

1    never was admitted to USC, and that is a distinguishing feature

2    from some of the other defendants that this Court sentenced

3    last week.

4         So, yes, is there a serendipity to it?  Absolutely.

5    But there's a serendipity to why those students didn't end up

6    going to Stanford as well.  The goal is the same, to take a

7    spot, but the actual facts on the ground are not that she took

8    a spot, and that's -- that is a difference here.

9         There's also -- the Government talks about being a

10   repeat player, and I also go to the Vandemoer case on that

11   point.  Here the goal was to take one spot; ultimately it

12   wasn't taken, fortunately, but the goal was to take one spot.

13   In the matter of the Stanford sailing coach, it was two or

14   three students that could have been impacted.  So when you're

15   talking about repeat players, it's a larger impact for the

16   core -- what's at the core of this case, which is taking slots,

17   to do it two or three times for two or three spots as opposed

18   to just the one.

19        At the close of the Government's argument, also talked

20   a little bit about money, and the Court's comments I think at

21   the Semprevivo hearing that there was no light between the

22   $250,000 that Devin Sloane paid and the $400,000 that Stephen

23   Semprevivo paid are kind of even amplified here.  Mr. Huneeus

24   paid $100,000.  He had agreed to pay another 200 that never got

25   paid, but he paid $50,000 to Singer's foundation, another

SEALED SIDEBAR REMOVED

1   $50,000 to USC.  The remaining $200,000 was supposed to be paid

2   upon final admission to USC.  That never happened.  That money

3   was never paid.

4        The Government's point about the tax deduction, the

5   tax issue with the IRS is really a calumny here.  The

6   Government knows, and this is clear from the tapes, he never

7   intended to take a tax deduction, he never did take a tax

8   deduction, and his plea agreement does not include an IRS

9   cooperation clause, unlike many of the parents who do have tax

10  violations.  So there is no tax issue here.

11       And as to the point that Mr. O'Connell quoted about

12  his conversation with Mr. Singer, the tapes also revealed that

13  the very next day Mr. Huneeus called Mr. Singer and apologized

14  for being flippant.  So that's, again, the full context of some

15  of these tapes.

16       So what about Mr. Huneeus as a person?  We haven't

17  talked about him yet today, really.  The Government portrayal

18  of him, as I said, stems from these series of tape clips, but

19  there's much more to the man both before he met Mr. Singer and

20  through today.  He has led a life reflecting the values that

21  his Chilean immigrant parents instilled in him:  Hard, honest

22  work, respect for others, fairness, compassion, love for

23  family, and devotion to his community, both in Chile and here.

24       You have before you letters from a number of people in

25  support of Mr. Huneeus, and I just want to highlight a few of

SEALED SIDEBAR REMOVED

1    the themes.  You have got letters from business leaders in Napa

2    Valley who attest to his integrity and honesty in business, and

3    you also have letters from farm workers who talk about how he

4    has trained them, mentored them, promoted them.  There's one

5    particularly poignant letter from someone who is now the event

6    planner at his former vineyard.

7         You have a number of letters from people who describe

8    during the tragic floods and fires in Napa Valley in 2017 how

9    Mr. Huneeus joined them in the fields, sleeves rolled up,

10   shovel in hand to make sure that they were safe, to make sure

11   they had safe places to live, that they were in good health,

12   and that's the kind of person he is.  He is a person who cares

13   deeply about others, has spent his life helping people he knows

14   and people he doesn't know.  That's why this crime is such an

15   aberration for him.  As the court knows from the letters and

16   the briefs, he has led a quite exemplary life.

17        One vignette about that, one of his former employees

18   in Chile wrote an article -- wrote a letter to the Court,

19   rather, about a union negotiation there, and how the most

20   important thing to Mr. Huneeus was not the economics of the

21   situation.  It was the health, safety, and welfare of the

22   people who were working there.  And the quote in the letter is

23   that "The humanitarian aspect always prevailed over the

24   economic side."  That's what Agustin's life has been marked by,

25   treating others fairly and with respect and helping people.

SEALED SIDEBAR REMOVED

1          Mr. Huneeus is beloved by his family, both here and in

2     Chile.  He is the proud father of four daughters, loving

3     husband of his wife, Maca, for nearly 25 years.  And his eldest

4     daughter is graduating college this spring, and since there's

5     been some reference to other children, I think it's important

6     to note that her college admission to one of the most selective

7     schools in the country had nothing to do with Rick Singer,

8     predated any relationship with him, was a completely normal

9     application and admission process.

10          There is no good reason for Mr. Huneeus's decision to

11     involve Rick Singer, particularly the fraudulent Rick Singer,

12     with his second daughter.  And he will wrestle with that for

13     the rest of his life.  As he wrote to the Court, I realize now

14     that cheating on her behalf was not about helping her.  He said

15     to the Court, it was about him, his ego.

16          To state the obvious, this case has been a blow to

17     him.  It's been a blow to his relationship with his family, his

18     friends, his former colleagues, his avocation.  But to his

19     great credit, Mr. Huneeus has not wallowed.  He has spent the

20     last nearly six or eight months trying to use this terrible

21     situation as a springboard, as an awakening in his personal

22     life, his family life, his community life.

23          And as you know from the briefs and the letters in

24     support, for the last many months he's been working with poor

25     and homeless people in San Francisco on the ground, cooking

1   meals, serving meals. And on the education front, which I know

2   that the Court has referenced at other sentencings, he has been

3   actively involved in created internship opportunities for the

4   children of people who work in Napa Valley on the farms,

5   through the Napa Valley Farm Workers Association, an

6   organization that is very dear to him, and to expose those high

7   school students to professional opportunities outside of the

8   farm. That's who Agustin Huneeus is, helping others, lifting

9   other people up, people close to him and people he doesn't

10  know.

11          On the subject of the wine business, Mr. Huneeus is

12  suffering, and will suffer for many years to come, as a result

13  of this case an inability to hold an alcoholic beverage

14  license, and therefore will not be able to work in the business

15  that he has loved for the last nearly 30 years. That is a

16  unique collateral consequence that is visited upon him that is

17  distinct from many of the parents who either own their own

18  businesses or don't work in licensed industries.

19          Now, one last point about Mr. Huneeus. The Government

20  breathed a lot of fire about him in its argument. Some of it's

21  taken out of context, as I mentioned, from the little bits of

22  tape, some of it not accurate, but not one word was spoken

23  about him since his plea in this case. At the sentencing

24  arguments from Mr. Sloane and Mr. Semprevivo, the Government

25  urged the Court to impose harsher sentences on them because, in

1   the Government's view, they had not taken responsibility, they

2   had hired outside experts, criminologists, psychologists to

3   contextualize their conduct.  Mr. Semprevivo had sued a school.

4          Mr. Huneeus has been a model of probity since his

5   guilty plea.  There is no equivocation about his acceptance of

6   responsibility.  He has been acting as a model member of the

7   community.  He didn't hire any experts to try to contextualize

8   what he did.  Instead, in an unvarnished way, he has taken

9   responsibility for it and written to the Court in an

10  unvarnished way about what he did and how he feels about it.

11         While difficult at times, he has moved forward --

12  attempted to move forward with grace and clarity in this case.

13  And that gets to our sentencing recommendation.  For starters,

14  Mr. Huneeus is the first defendant in a sentencing brief to

15  recommend a period of incarceration, and we've recommended a

16  sentence that we believe is fair and appropriate, consistent

17  with the guidelines, consistent with the 3553(a) factors, and

18  not some opening bid of thousands of hours of community service

19  and probation.  It's also a sentence that's consistent with the

20  fact that we've been listening to what's been going on in this

21  courtroom for the last several weeks.

22         As the Court observed, it's the fact of, not

23  necessarily the length of incarceration, that matters in some

24  cases, including, I submit, in this case.  So what about the

25  length?  The length that we recommend is longer than the

1  sentence that the Court imposed on Ms. Huffman and Mr. Caplan,

2  and that's because it respects the fact that Mr. Huneeus also

3  participated in the admission end of the scheme and not just

4  the testing as they did.

5       However, the sentence recommendation is lower and

6  shorter than the sentence the Court imposed on Mr. Semprevivo

7  and Mr. Sloane for two reasons.  First, both of those

8  defendants did secure a slot for their children, and in

9  Mr. Huneeus's case, he ultimately did not.  And the other

10  factor is both of those defendants in the Government's eyes

11  were not models of probity after their plea and Mr. Huneeus has

12  been.

13       The Government's recommendation, as the Court began to

14  engage with Mr. O'Connell at the end, is really out of

15  proportion with what's been happening in this Court over the

16  last several weeks, and is really also out of proportion with

17  its core prosecution theme.  In the end, relative sentences and

18  disparities are an important feature of 3553(a), and it is an

19  inescapable feature of this case that when USC sent out its

20  admission letters in late March or early April of this year,

21  there was no spot taken by Mr. Huneeus's daughter, and

22  therefore, his sentence should reflect that.

23       So for all those reasons, Your Honor, we respectfully

24  recommend a sentence of two months of incarceration, $95,000

25  fine, one year of supervised release with a special condition

─────────SEALED SIDEBAR REMOVED─────────

1  of 350 hours of community service, of course the $100 special

2  assessment.  Thank you.

3          THE COURT:  Thank you.

4          Mr. Huneeus, do you wish to address the Court?

5          THE DEFENDANT:  Yes, ma'am.

6          Today is a hard day, a super hard day, but after you

7  sentence me, the rest of my life begins.  I want more than

8  anything to pay for my crime and atone for the harm that I've

9  done, caused.  The consequences of my actions to those closest

10  to me have been devastating.  The public shame and notoriety I

11  have thrust upon them has impacted them all.  I have damaged

12  and humiliated my family.  My friends and the amazing people I

13  had the privilege to work with in our business are all victims

14  of my actions.  I have harmed and disappointed absolutely

15  everybody who loved me and cared about me.  I am sorry, and I

16  will do better.

17          Every spot in every college is important in our

18  society.  Nothing has a larger impact on income and equality

19  and social mobility than a college education.  Millions of kids

20  apply to college every year, and the top colleges can accept

21  just a tiny percentage of them.  And so many of these spots are

22  reserved for donors, athletes, legacies that the odds are even

23  tougher for most.

24          I am deeply ashamed of myself for taking a part in a

25  scheme that could have taken a deserving student's future away.

1    My actions threatened to disadvantage the very people that the

2    system was already stacked against.

3            I deserve the consequences of my actions and whatever

4    sentence you decide today.  I will use my time to figure out

5    how to come back and have an impact for good to those that I

6    have harmed.  I will commit to you today and all my friends and

7    family that have stood by me that I will get out and work to

8    redeem myself in the eyes of society.  Only when I achieve this

9    will I regain my self-worth and be worthy of the respect of my

10   friends and family again.

11           Thank you very much.

12           THE COURT:  Thank you.

13           I'm again starting out by considering, as I must, the

14   3553(a) factors and those factors through the lens of the

15   policies that sentencing is intended to serve.  I carefully

16   read 18 U.S.C. 3553(a)'s provision that I impose a sentence

17   sufficient but not greater than necessary to comply with the

18   purposes of sentencing.  And I've tried to do that in these

19   cases.  There is a -- there is a theme perhaps that's going

20   through each of these sentencings that's in front of me where

21   the Government tries to describe the man or woman who I'm

22   sentencing in the starkest terms of greed or selfishness or

23   demands, and defense counsel have tried to present the other

24   things about their clients that define them other than the

25   crime that they committed.

SEALED SIDEBAR REMOVED

1        And I made the comment before, after reading one of

2    the briefs in front of me, where counsel said that there are

3    two types of people convicted of crimes.  They are -- that

4    there are good people who make mistakes and bad people who get

5    caught, and I said then that that's not the way I view

6    sentencing, that I view sentencing that I am sentencing a

7    person who committed a crime.  And I think what all of

8    the -- what each of these cases has shown is before me, and

9    this one as well, is that these defendants committed a crime.

10   That's why we're here.  And that felony that they committed had

11   various aspects, which I will go through, and I do go through

12   and I evaluate it.

13       But in each case -- there is a person here before me

14   in this case, just as there is in every case that I have, and

15   the Government has not succeeded in any of these cases in

16   convincing me that I should sentence someone for their

17   brashness or selfishness or personal feelings.  In each case I

18   have tried to sentence them for the crime, and at the same time

19   in each of these cases the defendants have shown me the

20   defendant's exemplary lives and various positive things the

21   defendants have done, and that is my starting place.  I don't

22   start from the premise that these are not decent human beings

23   in front of me or that any other criminal defendant in front of

24   me doesn't start from a place of being fundamentally decent

25   people.

SEALED SIDEBAR REMOVED

1          I do look at the background of where people are, what

2     they've done, how they've accomplished their lives in trying to

3     think about how much I need the prison sentence to specifically

4     deter the particular defendant in front of me or to protect

5     society from the defendant in front of me, and in each of these

6     cases, and here as well, I do not see a need for specific

7     deterrence or to protect society from further acts of this

8     defendant.  But each time I come back to the question in this

9     series of cases of general deterrence, and the fact that there

10    is this crime that was undertaken where there was already so

11    many -- so many things in these defendants working in their

12    favor and yet they took these steps, and the notion that we

13    shouldn't need to have a Government wire and a Government

14    investigation to try to have people not behave in this way, and

15    so I've tried to do that here as well as before.

16          I don't find the fact that the defendant's daughter

17    ultimately didn't get into USC to be a game changer here.  I do

18    see this as a crime where the defendant engaged in both the

19    exam fraud and the attempt to buy a spot at the school.  And I

20    have some concern of just the greater level of disregard of the

21    child's interest here in letting the scheme proceed once she

22    was aware of the misconduct.  So I am taking those factors

23    here.

24          I do note this was not a case where the exam, the test

25    was taken for the child, but the child did go in and take it

SEALED SIDEBAR REMOVED

1  herself.  There was not an effort to get a tax deduction.

2  There was repeat conduct in the sense that both of the schemes

3  were engaged in.

4          So considering all of these things and trying to

5  ensure that the sentencing is within the same -- using the same

6  metrics that I have been using, I do have the sentence I intend

7  to impose here.  I guess the one last comment, just from my

8  notes, is having gone -- counsel went through some of the other

9  test-taking schemes where individuals have been sentenced to

10  time served or a day and didn't get any time on those, and I

11  did -- I would note that, at least the ones I'm familiar

12  with -- I didn't go through every one in your brief, but the

13  ones I'm familiar with involved foreign nationals.  In many

14  cases they also agreed as part of the sentence to an order of

15  deportation, and it was on an agreed plea with the Government

16  joining on a time-served sentence.  So I don't think those are

17  particularly helpful markers.

18          There were also other bribery cases, and I think

19  counsel noted that something in the order of 75 percent off the

20  guideline sentence was imposed in a number of them, even for

21  defendants who went to trial, but even for defendants who went

22  to trial suggests that perhaps the court may not have found

23  that going to trial was a reason to have a higher sentence.  I

24  don't know what happened in those cases.

25          But I would note that the sentences here have been

SEALED SIDEBAR REMOVED

1    coming in at substantially lower than what the plea agreement

2    envisioned as the guideline sentence for these cases.  At any

3    rate, that is -- the sentence I will impose will include

4    community service as the rehabilitative piece, a fine greater

5    than the guidelines provide for for the reasons that I do see

6    the amount that the money -- that people would agree to pay as

7    some indicator of what kind of a fine might or might not be

8    meaningful.

9         So in sum, I will impose a sentence sufficient, not

10   greater than necessary of five months imprisonment, a fine of

11   $100,000, supervised release for a period of two years with 500

12   hours of community service, direct service -- through an agency

13   providing direct service to students or families, and the $100

14   special assessment, the conditions of supervision that were

15   listed in the presentence report.

16        Any objection -- and no restitution.  Any objection

17   before I formally impose sentence?

18        MR. O'CONNELL:  No, Your Honor.

19        MR. STERNBERG:  No, Your Honor.

20        THE COURT:  Mr. Huneeus, will you please stand.

21        Pursuant to the Sentencing Reform Act of 1984 and

22   having considered the sentencing factors enumerated at 18

23   U.S.C. Section 3553(a), it is the judgment of the Court that

24   the defendant Agustin Francisco Huneeus is hereby sentenced

25   to -- is hereby committed to the custody of the Bureau of

SEALED SIDEBAR REMOVED

1    Prisons to be in prison for a term of five months.  Upon

2    release from imprisonment, the defendant shall be placed on

3    supervised release for a term of two years.  Within 72 hours of

4    release from custody of the Bureau of Prisons, the defendant

5    shall report in person to the district to which he is released.

6         It is further ordered that the defendant shall pay to

7    the United States a fine of $100,000, and that fine shall be

8    paid on a schedule set forth in the judgment.  While under the

9    Probation Office's supervision, the defendant shall comply with

10   the following terms and conditions:

11        Mandatory conditions:  You must not commit another

12   Federal, State or local crime.  You must not unlawfully possess

13   a controlled substance.  Drug testing conditions are suspended

14   based on the Court's determination that you pose a low risk of

15   substance abuse.  You must cooperate in the collection of DNA

16   as directed by the probation officer.  You must make -- pay --

17   sorry, no restitution.  You must pay the assessment imposed in

18   accordance with 18 U.S.C. Section 3013, and you must pay the

19   fine in accordance with a schedule of payments sheet of the

20   judgment.  You must notify the Court of any material change in

21   your economic circumstances that might affect your ability to

22   pay fines or special assessments until the time that they are

23   paid.  You must comply with the standard conditions that have

24   been adopted by the Court which are described at Sentencing

25   Guideline Section 5D1.3(c).

─────────────SEALED SIDEBAR REMOVED─────────────

1        Additional special conditions:  You are prohibited

2   from incurring new credit charges or opening additional lines

3   of credit without the approval of the Probation Office while

4   any financial obligations remain outstanding.  You shall

5   provide the Probation Office access to any financial

6   information which may be shared with the financial litigation

7   unit of the U.S. Attorney's Office while any financial

8   obligations remain outstanding.  I dont know if I said the $100

9   special assessment.

10        The sentence is imposed for all the reasons previously

11  stated and because the Court believes the sentence and all its

12  components is reasonable and is a sentence that is sufficient

13  but not greater than necessary to accomplish the goals of

14  sentencing consistent with 18 U.S.C. Section 3553 and the

15  Supreme Court's guidance.

16        Appellate rights:  The plea agreement you have entered

17  into with the Government limits your rights of appeal, and

18  under the terms of your plea agreement, you've waived your

19  right to challenge your conviction or your sentence -- and your

20  sentence on both direct appeal and at a future proceeding.  You

21  may still appeal on the grounds of ineffective assistance of

22  counsel or that the prosecutor engaged in misconduct.  Sentence

23  is imposed as stated.  So you may be seated.

24        There's no objection presumably to self-reporting?

25        MR. O'CONNELL:  No, Your Honor.

SEALED SIDEBAR REMOVED

1          U.S. PROBATION:  And, Your Honor, I believe you also

2     indicated that he was to complete five [sic] hours of community

3     service.

4          THE COURT:  Thank you.  Thank you.

5          The sentence includes a term of 500 hours of community

6     service at an agency approved by the Probation Office providing

7     direct service to students or families.

8          No objection to self-reporting?

9          MR. O'CONNELL:  No, Your Honor.

10          THE COURT:  And a date for self-reporting?

11          U.S. PROBATION:  Six weeks, Your Honor, would be

12     November 15th, unless there's a different request.

13          MR. STERNBERG:  If there's any way to move that up a

14     week or two, that would be requested.

15          THE COURT:  What's the earliest they can -- you mean

16     making it earlier?

17          MR. STERNBERG:  Make it earlier.

18          U.S. PROBATION:  The Bureau of Prisons requests four

19     to six weeks.  So if he wanted to move it up to four weeks, it

20     could be November 1st.

21          MR. STERNBERG:  Yes.  Thank you.

22          THE COURT:  So we'll have you self-reporting November

23     1st.  Is there any request for -- as to recommendation for a

24     location?

25          MR. STERNBERG:  Yes, Your Honor.  Generally a

SEALED SIDEBAR REMOVED

1   recommendation for the Northern District of California and

2   specifically for the Atwater facility.  And, Your Honor, I'm

3   told that November 4th is a Monday.  Is there any way we could

4   have the report date be a Monday, November 4th?

5          U.S. PROBATION:  I don't see any reason why not.

6          THE COURT:  That's fine.  November 4th.

7          MR. STERNBERG:  Thank you.

8          THE COURT:  I can make a request for a facility

9   commensurate with his security level in the Northern District

10  of California.  You gave a specific facility.  The Bureau of

11  Prisons doesn't appreciate my making a facility request.  If

12  you want to give me a more narrow location, I can do that.

13         MR. STERNBERG:  A minimum security facility within 200

14  miles of San Francisco.

15         THE COURT:  Okay.  I will include that.

16         MR. STERNBERG:  Thank you, Your Honor.

17         THE COURT:  I find by clear and convincing evidence

18  that Mr. Huneeus is not likely to flee or pose a danger to the

19  safety of any person or the community if released, and the

20  release requires you to self-report on November 4th at the

21  facility that will be designated.

22         Failure to surrender for service of a sentence shall

23  result in punishment of a fine or imprisonment of not more than

24  ten years.  And any such term of imprisonment would be

25  consecutive to the sentence of imprisonment here.  And any

SEALED SIDEBAR REMOVED

1   conviction of an offense while on release shall be sentenced,

2   in addition to the sentence prescribed here, to a term of

3   imprisonment of not more than ten years if the offense is a

4   felony or a term of imprisonment not more than one year if the

5   offense is a misdemeanor.

6          So with that, Mr. Huneeus, you are directed to

7   self-report to the BOP facility in -- on November 4th, and I

8   wish you luck, sir.

9          THE CLERK:  Court is in recess.  All rise.

10         (Adjourned, 3:49 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SEALED SIDEBAR REMOVED

1               CERTIFICATE OF OFFICIAL REPORTER

2

3           I, Linda Walsh, Registered Professional Reporter

4  and Certified Realtime Reporter, in and for the United States

5  District Court for the District of Massachusetts, do hereby

6  certify that the foregoing transcript is a true and correct

7  transcript of the stenographically reported proceedings held in

8  the above-entitled matter to the best of my skill and ability.

9           Dated this 7th day of October, 2019.

10

11

12          /s/ Linda Walsh_____

13          Linda Walsh, RPR, CRR

14          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25